KATIE THOMPSON ASHTON *vs.* SUSAN L. THOMPSON, impleaded, etc.

April 9, 1884.

**Equity—Setting aside Donations to one holding Confidential or Fiduciary Relation to Donor.**—Upon grounds of *public policy*, or, as it is otherwise expressed, of *public utility*, equity exercises a salutary jurisdiction in setting aside donations of property made to a donee who stands in some confidential or fiduciary relation to the donor. The relief granted in such cases rests upon a general principle applicable to all relations in which dominion is exercised by one person over another. The confidential relation of parent and child, and the fiduciary relation of guardian and ward, are among those in which such relief is frequently granted.

**Same—Donation by Child to Parent.**—Equity looks with special jealousy upon donations from a child to a parent when made recently after the child comes of age, or while he is under the constant and immediate influence of the parent, (as, for instance, residing with him,) or while his property is in the parent's possession or control.

**Same--By Ward to Guardian.**—Donations from a ward to a guardian are regarded with still greater jealousy where the circumstances are such as to give the guardian an ascendency over the ward.

**Same—Burden of Showing Transaction Righteous.**—Whether the donation be from a child to a parent, or by a ward to his guardian, if the donor is so placed as to be subject to the control or influence of the donee, the *onus* is on the parent or guardian (as the case may be) to show that the transaction is "righteous."

**Same—Undue Influence presumed.**—In such cases the undue influence is, on grounds of public policy, *prima facie* presumed from the peculiar relations subsisting between the parties.

**Same—Donation from Ward to Ex-Guardian.**—Substantially the same rules are applicable to the case of an ex-guardian, where, notwithstanding the termination of the formal fiduciary relation between him and his ward, he still retains his dominion in fact, and his position of influence as respects the ward or his property. This is especially true where the donations called in question are made while (even after his majority) the ward continues to reside with the ex-guardian, or the ex-guardian continues to retain possession or control of the ward's property.

**Same—Influence must be exerted for benefit of Ward, etc.**—In all those cases where the law infers from the relations of the parties the probability of undue influence on the part of the party having dominion or ascendency over another, it requires that the influence in fact exercised shall be exerted for the benefit of the person subject to it, and not for the benefit of the party possessing it; otherwise the donations will be promptly set aside.

**Same—Application.**—Application of these principles to the facts of this case arising between a parent and ex-guardian, and her child and ward.

Plaintiff ʋrought this action in July, 1879, in the district court for Ramsey county against her mother Susan L. Thompson and her uncle Horace Thompson, who had been her guardians, to set aside a settlement and a transfer of property made by her to the former 14 months after she became of age, and for an accounting. The case stated by her in the complaint is in substance as follows:

Plaintiff, the daughter of James Egbert Thompson, late of the city of St. Paul, and of the defendant Susan L. Thompson, was born in August, 1856. Her father died intestate, May 27, 1870, and his es-

tate was administered in the probate court of Ramsey county, and, on October 5, 1871, was distributed to his widow, to the plaintiff, and to her four sisters, the court assigning to the plaintiff an undivided one-fifth of the real estate, subject to the dower of the defendant Susan L., and an undivided one-sixth of the personalty. Her share of the real estate she alleges was worth about $6,500, and her share of the personalty about $43,000.

At or about the date of the decree of distribution, (October 5, 1871,) the defendant Susan L. and the defendant Horace Thompson (the latter being a brother of the plaintiff's father) were appointed and qualified as her guardians, and continued to act as such until their discharge, on the termination of the guardianship, on or about October 17, 1876. During the period of the guardianship the defendants received and disbursed all the income and proceeds of the property so assigned to plaintiff, and had the same completely within their control as guardians for her benefit, and all the net income was by them paid over to the defendant Susan L., the plaintiff receiving only what was paid over to her by Susan L., or was paid for her use by the defendants.

Between October 5, 1871, and October 17, 1876, a large amount of money was thus received and paid over to defendant Susan L., of which but a small portion was paid to plaintiff or to her use, and the residue was applied by the defendant Susan L. for her own use, the particular amounts being stated in the complaint. Accounts of the guardianship were made from time to time, and, soon after reaching the age of 18 years, the plaintiff signed a general release to her guardians, but she did not and was not competent to examine the accounts and release, nor did she have the aid of any competent independent person or legal adviser to examine them for her. And she charges that the accounts falsely overstate the debits and understate the credits of the plaintiff.

From the discharge of the guardians, October 17, 1876, until September, 1877, the plaintiff continued to live as she always had done in the family and under the habitual influence and control of the defendant Susan L., who continued to receive and disburse the income of the estate, paying a small part to the plaintiff, and keeping

and using the rest for her own benefit, the amounts being stated in the complaint.

On June 26, 1877, the plaintiff and those of her sisters who were also of age, (one of them being older and two younger than herself,) made with the defendant Susan L. a settlement in writing, which is set out in full in the complaint.

This instrument, made "between Susan L. Thompson of the first part, and Lena B. Thompson, Katie Thompson, Carrie J. Thompson and Ella F. Thompson, of the second part," recites that "certain differences of opinion have arisen and have heretofore existed between the said Susan L. Thompson, of the one part, and the said Lena, Katie, and Carrie J. Thompson, of the other part, as to the disposition of certain real estate and personal property to which the said Lena, Katie, and Carrie J. became by law entitled as three of the children and heirs-at-law of James Egbert Thompson, deceased, and as awarded to them as such heirs-at-law by the probate court of Ramsey county, and which real estate and personal property they afterwards conveyed to the said Susan L. Thompson, by certain deeds and bills of sale;" and that Ella F. is now of lawful age, and entitled to a settlement with her guardians, and a division of the real and personal property, neither of which has been had; and that "it is the declared object of this instrument, and the intent of all the parties hereto, to make a settlement between the said parties respectively, such as will forever set at rest all the said differences of opinion, and to make an equitable division of the property in controversy between the said parties;" and that Susie Thompson, another of the children, is still a minor and under legal guardianship, and cannot join in the agreement; and that "the said Susan L. Thompson still holds and retains her dower interest in and to all the said estate belonging to said deceased, except such part thereof as has been heretofore sold at guardian's sale."

The instrument then provides (in article 1) that as soon as practicable the accounts of guardianship of Ella F. and Susie shall be rendered and settled in the probate court, and their shares of the estate awarded to them, and proceeds as follows:

"*Second.* As soon as the said interest of the said Susie Thompson

shall be so ascertained, an accurate and true account shall be made of all stocks, bonds, and other personal property which originally belonged to the said James Egbert Thompson, deceased, or which now remains on hand, either in the hands of the said Susan L. Thompson in her own right, or conveyed to her by the said Lena B., Katie or Josie, or belonging to the said Ella F., or in the hands of her guardians, and in the hands of the guardians of said Susie Thompson.

"*Third*. All the incomes, dividends, and proceeds of the said estate of said James Egbert Thompson, deceased, and which shall have been duly ascertained and declared, and credited to account of either the said Susan L. Thompson, Katie, Lena, Carrie J., and Ella Thompson, up to and including the first day of July, 1877, and including the regular semi-annual dividend of the stock of First National Bank of St. Paul which will accrue on that date, shall be paid over and credited to the account of the said Susan L. Thompson. And it is the intention and wish of the said Lena B., Katie, Carrie J., and Ella F. Thompson to forever release and relinquish to the said Susan L. Thompson any and all dividends, rents, issues, and profits of all real estate and personal property of the said J. E. Thompson which has heretofore accrued, and which shall accrue up to said first day of July, 1877, and to which they, or any of them, may have had any right, title, or interest, whether legal or equitable: Provided, that this release shall not relate to any of the scrip dividends of the stocks of the St. Paul & Sioux City Railroad Company, or to any of the compensation stock, or other natural increase of said stocks, or of any other stocks, contracts, or assets of said estate. But it is intended to apply only to the cash dividends and incomes of said property, which has heretofore been received by said Susan L. Thompson, or by the guardians of said Ella F.

"*Fourth*. [This provides that after Susie's share is ascertained and set apart to her, any balance of money found due to Ella F. from her guardians, on final settlement of their accounts, shall be paid over to her.]

"*Fifth*. After deducting the share of stocks, bonds and other personal property in the hands of said guardians, which shall be awarded by said probate court to said Susie Thompson, and leaving the same

with her g1ardians, all the balance of the First National Bank stock, stocks of the St. Paul & Sioux City Railroad Company of all kinds * * * which originally belonged to the estate of said James Egbert Thompson, deceased, and now remaining in the hands of, or belonging legally or equitably to, said Susan L. Thompson, Lena B., Katie, Carrie J., and Ella F. Thompson, and including all undivided interests in such personal property, and of all other personal property which originally belonged to said estate and now remaining unsold, shall be divided into five equal shares, whereof one equal share shall be at once conveyed to the said Susan L. Thompson, and one equal share thereof shall at once be conveyed to each of the said Lena B., Katie, Carrie J., and Ella F. Thompson," and the parties bind themselves to make all necessary transfers and conveyances.

"*Sixth.* [This provides that the income accruing after July 1, 1877, on the property so to be divided, shall be divided in the same manner as the capital.]

"*Seventh.* [This provides for a division of any income that might accrue from other specified sources in the same proportion.]

"*Eighth.* The said Susan L. Thompson shall forthwith * * transfer to said Lena B., Katie and Carrie J. Thompson 200 shares of the capital stock of the First National Bank of St. Paul, to each of them, in part fulfilment of this agreement," and also reconvey to each of them "an equal undivided one-fifth of all the real estate which belonged to the estate of said James Egbert Thompson, deceased, * * being the same real estate which said three children have heretofore conveyed to her by the deeds above referred to."

"*Ninth.* The said Susan L. Thompson shall also convey unto the said Lena B., Katie, Carrie J., and Ella F. Thompson all her dower and right of dower," in the 4-5 of said real estate agreed to be conveyed to them.

"*Tenth.* Upon the said final division of said personal property and stocks, according to this agreement, and the execution and delivery of said deeds of conveyance and of said relinquishment of dower, the said Lena B. Thompson promises and agrees to pay to the said Susan L. Thompson the sum of eight thousand ($8,000) in money; and the said Katie, Carrie J., and Ella F. Thompson agree, each for them-

selves, to pay to said Susan L. Thompson the sum of three thousand ($3,000) dollars in money; being $9,000, in all, from said three last-named children.

"*Eleventh.* The performance of this contract on the part of said Susan L. Thompson shall be a full settlement and adjustment of all claims and demands, legal or equitable, against the said Susan L. Thompson, in favor of either the said Lena B., Katie, Carrie J., and Ella F. Thompson in all matters arising out of the settlement of the estate of said James Egbert Thompson, deceased. And they hereby mutually and solemnly bind themselves, their heirs and assigns forever, from any and all further accounting or demand in the premises, and hereby acknowledge that the said contract, when executed and carried out by said Susan L. Thompson, shall forever set at rest any claims or demands for any property or interests to which they were entitled as heirs-at-law of their said father, and all incomes, rents, proceeds or profits thereof.

"*Twelfth.* [This excepts from the operation of the instrument the separate property of Susan L. Thompson, owned by her during her husband's lifetime.]

"*Thirteenth.* The said Lena B., Katie, Carrie J., and Ella F. Thompson, in consideration of the foregoing agreement, and upon the completion thereof, will release to said Susan L. Thompson all their right, title, and interest in and to all the household furniture, books, paintings, and other personal property, carriages, sleighs, and other stable property, now situated in Fairview, as heirs-at-law of J. E. Thompson, deceased."

This instrument was signed and sealed by all the parties.

The complaint goes on to charge that on and long prior to June 26, 1877, the defendant Susan L. had falsely pretended that she was the owner of all plaintiff's said estate, and that it was plaintiff's filial duty to convey it to her, had threatened to keep it from plaintiff, and had used all her influence as parent, guardian, and manager and controller of plaintiff and her estate, urgently, persistently, and harshly to make plaintiff execute the settlement; that plaintiff was still greatly under the habitual influence and fear of the defendant Susan L., was in fear of losing her estate, and very anxious to get the remainder of

her property into her own possession; that defendant Susan L. procured H. B. Whipple, the Episcopal Bishop of Minnesota, to conspire with her, and, acting as plaintiff's religious adviser, to corruptly advise and represent to her that the settlement was fair and right, and that it was her duty to sign it; that she had not nor had ever had any legal or competent disinterested adviser to examine defendants' accounts, or instruct her as to the value of her estate, nor did defendants or any one suggest to her the need of such, and that she was utterly unskilled in accounts and ignorant of the nature and value of what she released and what she received by the settlement; and it charges that defendant Susan L. was fully informed on all these points, and charges fraudulent misrepresentation and concealment on her part to induce plaintiff to make a disadvantageous settlement, "and that, influenced and induced by said relationship, fears, anxiety, ignorance, misrepresentations and concealment of the truth, importunities and corrupt advice, and not otherwise, this plaintiff, about two o'clock in the morning following said last-named day, signed and executed said settlement as aforesaid."

The charge of conspiracy between defendant Susan L. and Bishop Whipple is expressly retracted in the reply.

The complaint further states that, after making the settlement, the defendant took and has since retained from funds of plaintiff the sum of $3,000, as provided in article 13, and in August, 1877, sold and appropriated to her own use plaintiff's interest in the furniture and personal property at Fairview, which interest was worth $6,000; that the value of the property and claims released by plaintiff in the settlement was not less than $32,000, and that the only consideration for such release was defendant Susan L.'s release of her dower right, which was not worth over $2,000. That in September, 1877, defendant Susan L. departed for Europe and there resided until June, 1879; and that in December, 1877, plaintiff was married to and is now the wife of Isaiah H. Ashton. Judgment is demanded that the settlement be cancelled as to the plaintiff, for a full accounting by defendants as guardians, for a separate accounting by defendant Susan L., and for other specific and for general relief.

The defendants, in their joint answer, pleaded as an estoppel the

accountings and orders and judgments of the probate court thereon, the last (of date October 17, 1876) being the guardians' final accounting. They put in issue all the charges of fraud, undue influence, etc., as well as most of the amounts stated in the complaint. They aver that on October 17, 1876, they, as guardians, paid over to plaintiff the moneys ($6,482.95) found due her on the final accounting, and delivered to her all the stocks, bonds, and other property, constituting her share of her father's estate, taking from her a receipt therefor, and thereupon she took actual possession of all the real and personal property to which she was entitled as one of her father's children and heirs-at-law, she being then over twenty years of age, and having been of full age for more than two years. That afterwards the plaintiff, of her own free will, and moved by considerations then regarded by her as sufficient, though without any money consideration, did convey and transfer all her real and personal property to the defendant Susan L., who received the gift and thereafter used the income therefrom for plaintiff's benefit. They allege that the settlement of June 26, 1877, was made by plaintiff as her free and voluntary act, after most careful and deliberate consideration and discussion, and with a full understanding of all its terms. That the defendant Susan L. did not request Bishop Whipple to take any part in the negotiation, but on the contrary, he acted as plaintiff's adviser on plaintiff's own request; and that defendant Susan L. has made all the conveyances and transfers required by the settlement.

The plaintiff in her reply attacks the accountings in the probate court and the judgment thereon, denies that she took or had actual possession of the money or any other part of the estate assigned to her, or that the sum of $6,482.95, adjudged to her on the final accounting on October 17, 1876, was in fact paid over to her, alleging that it was merely placed to her credit on or about that day in the First National Bank, and at once transferred to the credit of defendant Susan L. She denies that the conveyances and transfers then made were executed and delivered by her of her own free will, and alleges that long before October 17, 1876, and while she was under the age of 18 years, and resided with the defendant Susan L. in Germany, she signed a paper purporting to transfer all her property to

v.32—3

said defendant, being moved thereto by said defendant's threats, harsh treatment, and false representation that such conveyance was proper, just and in accordance with her filial duty; and that the conveyances and transfers made on or about October 17, 1876, were signed by her on the false representation made by defendant Susan L. that they were of the same effect as the paper already signed in Germany. She admits that Bishop Whipple was not requested by defendant Susan L. to advise plaintiff, and withdraws the charge of conspiracy made in the complaint, and avers the fact to be that he was requested by defendant Horace Thompson to use his influence with plaintiff and defendant Susan L., and that he gave his advice as a religious adviser and not as an expert in financial matters and legal questions, and was not acquainted with the financial matters and the legal rights involved in the settlement.

At the trial before *Simons*, J., the plaintiff withdrew all charges of fraud against the defendant Horace Thompson, and in the decision judgment was ordered in his favor. It appeared that plaintiff's father, James Egbert Thompson, had left an unsigned draft of a will, by which, as construed by his widow and children, he left his entire estate to his widow and five children, share and share alike, the widow however to receive the income during life and with it to maintain the children until they should marry. Upon marriage of any child during her mother's lifetime, such child was to receive for five years the income of $20,000 of the stock of the First National Bank of St. Paul during five years, and at the end of that time the stock was to be transferred; and there was evidence that the plaintiff and the other children, as they became of age, in transferring their share of their father's estate to their mother, did so in the belief that they were thereby carrying out their father's wishes.

As to most of the matters in issue there was a great conflict of evidence. With regard to the circumstances attending the settlement of June 26, 1877, it was contended by the defendants, by evidence and upon argument, that Bishop Whipple and Horace Thompson acted as advisers of the plaintiff, and as her agents in effecting the settlement; while for the plaintiff it was insisted that those gentlemen merely conveyed to her her mother's propositions, and did not

advise her as to the value of the property involved and relinquished by her, or as to her legal rights. The court held the accountings in the probate court and the judgment thereon to be conclusive, and ordered judgment in favor of the defendant Horace Thompson. Upon findings of fact and conclusions of law which are stated in the following opinion, judgment was ordered for plaintiff against the defendant Susan L. Thompson. Her motion for a new trial was heard and denied by *Wilkin, Simons* and *Brill,* JJ., and she appealed to this court. A former appeal from an order refusing to hear a motion for a new trial is reported, 28 Minn. 330.

*Gordon E. Cole* and *C. K. Davis,* for appellant.

*C. D. O'Brien* and *Frederick Allis,* for respondent.

BERRY, J.[1] Facts are found in this case as follows: The plaintiff was born August 16, 1856, and was married to Isaiah Ashton in December, 1877. Her father, James E. Thompson, died intestate on May 27, 1870. His estate was duly administered and distributed to the defendant, who was his widow and plaintiff's mother, and to his other heirs, and on October 5, 1871, one-fifth part of his real estate, subject to defendant's dower, and one-sixth part of his personal property, were duly assigned to the plaintiff. The real estate, etc., assigned to plaintiff was of the value of $6,500, and the personal property of the value of $43,000. On October 5, 1871, the defendant and Horace Thompson, brother of J. E. Thompson, were duly appointed guardians of plaintiff. They qualified and entered upon their duties, taking possession of the real and personal property assigned to her, and receiving and disbursing the income and profits thereof. On October 18, 1876, the account of plaintiff's guardians was duly allowed in the probate court, and a decree made ascertaining and to her assigning the property in their hands to her belonging. On the same day the guardians delivered to her a check, payable to her order, for $6,842.95, being the money belonging to her found in her guardians' hands. She immediately indorsed and delivered the check to defendant. On the same day she executed and delivered to defendant four deeds, conveying all her right, title, and interest in the real es-

---

[1] Gilfillan, C. J., and Dickinson, J., did not hear the argument or take part in the decision of this case.

tate decreed to her as above stated, and also a bill of sale conveying to defendant all the money, including the $6,842.95 above mentioned, and all the personal property of every description belonging to her and assigned to her by the decree aforesaid.

The conveyances and bill of sale embraced and conveyed all the plaintiff's property of every description, including all income which had accrued or should accrue therefrom. Plaintiff never had in her actual possession or under her control any part of said real estate or personal property, or of the income thereof, (save the momentary possession of the check,) until July 1, 1877. No consideration whatever was paid to the plaintiff, or agreed or intended to be paid to her, by the defendant or by any one for the personal property, (including the check,) or for the real estate thus conveyed and transferred to defendant, but the same was "purely and simply a gift" from the plaintiff to her mother. "And I find as a fact," says the trial judge, "that the plaintiff did not make said gift of her own free will; that it was not her voluntary act; but that she was moved and induced thereto by the solicitations of her mother, and through her personal influence, which then was and always had been very great over the plaintiff, and without fully understanding the character, extent, or value of her property, without due deliberation, without comprehending or realizing the fact that in executing said conveyances she was divesting herself of her entire estate, and without the counsel or assistance of a disinterested, independent adviser, and under the false impression, derived from an unsigned memorandum or draft of a will left by her father, and from conversations with and statements made by her mother, that in executing such conveyances she was carrying out the wishes and desires of her deceased father." The deeds were duly recorded, and under them and the bill of sale, respectively, the defendant took possession of the real estate and personal property therein embraced, and collected and applied to her own use and benefit the rents, income, dividends, and profits arising therefrom, from October 18, 1876, to July 1, 1877; and also took into her possession and applied to her own use the sum of $6,482.95, represented by the check.

In February, 1877, "plaintiff for the first time became aware of and

realized the fact that she had, in the manner above stated, made an absolute gift to her mother of her entire estate   *   *   *   inherited from her   *   *   *   father," and being very anxious to regain the same, or some portion thereof, she applied to Horace Thompson and Bishop Whipple to counsel and assist her in effecting a settlement with her mother, and, they assenting, negotiations were entered into, which resulted in an agreement, evidenced by a written instrument, made June 26, 1877, between plaintiff and three of her sisters (who occupied a position analogous to that of plaintiff) on the one side, and the defendant on the other.

Referring to the reporter's statement of the case for any fuller account of the contents of the instrument which may be deemed advisable, it is sufficient, for the purposes of this opinion, to say that by its terms the plaintiff was to surrender, give, and relinquish to defendant a considerable part (of the value of several thousand dollars, in addition to the amount of the check before mentioned, viz., $6,482.95) of the share of her father's estate, to which plaintiff was lawfully entitled. Subject to such gift, surrender, and relinquishment, defendant was to restore to plaintiff what she had transferred to defendant by the transactions of October, 1876, before mentioned. For the surrender, gift, and relinquishment, the trial court finds that "no consideration whatever was paid or agreed to be paid" by the defendant or any other person, except the defendant's right of dower in plaintiff's share (one undivided fifth part) of her father's real estate, which right of dower was of the value of $2,000, and no more. The trial court further finds as follows:

"And I find, as a fact, that said agreement, dated June 26, 1877, was executed by the plaintiff while she was a member of the family of the said Susan L. Thompson, wholly dependent upon her for support, and under her habitual influence and control.

"That when the plaintiff first understood and comprehended the fact that she had, in the manner aforesaid, divested herself of her entire estate, and that she was wholly dependent upon her mother for her support and maintenance, she became very anxious that some settlement or arrangement should be made with her mother, whereby her said estate and property, or at least some portion thereof, should

be reconveyed to her, and placed under her own management and control.

"The said Susan L. Thompson was strongly opposed to any such settlement or arrangement, and desired to retain said property in her possession and control, which was well known to the plaintiff.

"That such was the influence of the plaintiff's said mother over and her attitude towards her, that the plaintiff, through fear of her displeasure, did not personally make known to her her desire that the said property should be reconveyed to her, but instead thereof applied to her said uncle and the said Whipple to aid her therein as above stated; and, after consultation between the defendants and said Whipple, and between said Horace Thompson, said Whipple, and the plaintiff and her said three sisters, the terms of said agreement were settled upon, and were assented to by the plaintiff, and thereupon said agreement was reduced to writing by the attorney of said Susan L. Thompson, and was signed by the said parties thereto, including the plaintiff.

"And although before said agreement was executed, and after the said application of the plaintiff to her uncle and the said Whipple, and after the said consultation as above stated, the said Susan L. Thompson stated to the plaintiff that if she did not desire to abide by the said conveyance of October 18, 1876, or to leave said property in her possession—which she still insisted was the wish of the plaintiff's said father—she was willing to transfer to the plaintiff the portion of said property to which she was by law entitled, yet I find the fact to be that the plaintiff did not sign said agreement of her own free will and accord, but that she was influenced thereto through fear of her mother, and being still under the false impression, derived from her mother, and from said unsigned memorandum left by her father as above stated, that it was the wish of her father that she should not have the possession of the whole of her said property, and in the hope of creating pleasant feelings between her mother and herself, and through her extreme anxiety that a settlement should be effected in order that she might, to some extent at least, be pecuniarily independent, and through the apprehension that unless some settlement was at that time effected, she would never regain her rights, she ac-

ASHTON *v*. THOMPSON.     **39**

cepted said agreement and settlement, and consented to the concessions in favor of her mother, contained in the third, tenth, and thirteenth articles thereof, hastily, without legal advice, without knowledge or information of the value or amount of the income, dividends, rents, and other property which she thereby released, relinquished, and conveyed to her mother, and without thought or question whether she was or was not thereby receiving all her rights to which she was by law entitled as heir of her said deceased father.

"And I also find that the said Horace Thompson and the said Whipple did not, nor did either of them, nor did the said Susan L. Thompson, in any manner, or to any extent whatever, instruct, counsel, or advise the plaintiff as to her rights, or as to the extent or value of her said property, income, rents, and dividends which by said agreement she relinquished to her said mother, and that she did not receive such instruction, counsel, or advice from any other person or source whatever, and that she did not have the benefit of an independent adviser in said settlement."

The terms of the agreement evidenced by the instrument of June 26, 1877, were on August 24, 1877, carried out by proper conveyances, transfers, and other proceedings on both sides, and without further consideration to the plaintiff than as before stated. The defendant departed from this state and from the United States in September, 1877, and did not return to this state until June, 1879. This action was commenced in July, 1879.

So far as deemed important upon this appeal this is the substance of the findings of fact. In our opinion they are substantially sustained by competent evidence reasonably tending to support them. With the exception of that given by defendant herself, the testimony was oral. The case was one calculated to arouse considerable feeling in the family of which most of the witnesses (the defendant and her daughters) were members. That there was more or less conflict in the evidence is therefore not at all surprising, and the case is emphatically one in which the learned and experienced trial judge, who saw and heard the witnesses, was in a position to arrive at the facts far superior to that occupied by this court, which can look only at the printed record. Besides, a motion for a new trial upon the ground,

among other things, that the findings of fact were not justified by the evidence, was heard before the three judges of the district court for Ramsey county, sitting in bank, and denied. In these circumstances it would require a far stronger case than is presented here to induce us to disturb a finding as against evidence.

As conclusions of law the trial court finds, among others, the following: That, as against the plaintiff, the deeds and bill of sale of October 18, 1876, and the agreement and settlement of June 26, 1877, and the conveyance made by plaintiff in pursuance thereof on August 24, 1877, are null and void; that the deeds and conveyances executed by defendant on or about August 24, 1877, in and by which she reconveyed to the plaintiff the real estate which plaintiff had before conveyed to her, and by which she relinquished her right of dower therein, and by which she relinquished to plaintiff the stocks, bonds, and other personal property before conveyed to her by plaintiff, are null and void; that plaintiff is entitled to an accounting by defendant of all and singular the income, dividends, issues, rents, and profits which accrued from said above-described real estate, and from said stocks, bonds, and other personal property which belonged to the plaintiff, as heir of James E. Thompson, and were assigned to her by the decree of the probate court, from the seventeenth day of October, 1876, up to and including the first day of July, 1877, and for said sum of $6,482.95, (represented by the check,) and for the sum of $3,000 paid by plaintiff to defendant under the agreement of June 26, 1877, and for the value of plaintiff's interest in the household furniture and other personal property, also conveyed under said agreement, August 24, 1877; and that the defendant is entitled to an accounting by plaintiff of the value of her dower right, aforesaid, since July 1, 1877. Judgment was directed accordingly. Speaking generally, the substantial effect of these findings of law would appear to be to restore the plaintiff and defendant, respectively and relatively to each other, to the position occupied by each on October 17, 1876, after the decree of the probate court assigning to plaintiff her share in her deceased father's estate.

The record is unusually voluminous, and the case was discussed by counsel at great length, and from many points of view. Ques-

tions of pleading and practice were raised, as well as very many upon the merits. While we have endeavored to duly consider all that was urged by counsel, we have come to the conclusion that the case lies in a comparatively narrow compass, and may fairly and justly be determined by the application of a few well-settled rules of equity. To these we will mainly confine ourselves, without consuming time or space in taking up the positions of counsel in detail.

Upon grounds of public policy, or, as it is otherwise expressed, of public utility, equity exercises a salutary jurisdiction in setting aside donations of property made to a donee who stands in some confidential or fiduciary relation to the donor. The relief granted in such cases rests upon a general principle applicable to all relations in which dominion is exercised by one person over another. *Dent* v. *Bennett*, 4 Mylne & Cr. 269; 1 Story, Eq. Jur. §§ 307, 308; *Rockafellow* v. *Newcomb*, 57 Ill. 186. The confidential relation of parent and child, and the fiduciary relation of guardian and ward, are among those in which such relief is frequently granted. Equity looks with special jealousy upon donations from a child to a parent when made recently after the child comes of age, or while he is under the constant and immediate influence of the parent, (as, for instance, residing with him,) or while his property is in the parent's possession or control. *Wright* v. *Vanderplank*, 8 De Gex, M. & G. 133; *Baker* v. *Bradley*, 7 De Gex, M. & G. 597; *Bergen* v. *Udall*, 31 Barb. 9; *Taylor* v. *Taylor*, 8 How. 183; 2 Pom. Eq. Jur. § 961. Donations from a ward to his guardian are regarded with still greater jealousy where the circumstances are such as to give the guardian an ascendency over the ward, for here the natural and mutual ties and obligations between parent and child are wanting, and the position of the guardian is fiduciary. *Hylton* v. *Hylton*, 2 Ves. Sr. 547; *Hatch* v. *Hatch*, 9 Ves. 292, and note; *Fish* v. *Miller*, Hoff. Ch. 267; 2 Pom. Eq. Jur. § 962. Whether the donation be from a child to a parent or by a ward to his guardian, if the donor is so placed as to be subject to the control or influence of the donee, the *onus* is on the parent or guardian (as the case may be) to show that "the transaction is righteous." *Gibson* v. *Jeyes*, 6 Ves. 266; *Hoghton* v. *Hoghton*, 15 Beav. 278, 299. In such cases the undue influence is, on grounds of public policy, *prima facie* presumed

from the peculiar relations subsisting between the parties. *Archer* v. *Hudson*, 7 Beav. 551; *Hylton* v. *Hylton, supra; Hatch* v. *Hatch, supra;* Kerr on Fraud & Mistake, 178, 179; *Williams* v. *Powell*, 1 Ired. Eq. 460; *Chambers* v. *Crabbe*, 34 Beav. 457; *Garvin* v. *Williams*, 44 Mo. 465; *Todd* v. *Grove*, 33 Md. 188; *Berdoe* v. *Dawson*, 34 Beav. 603; *Huguenin* v. *Baseley*, 2 Lead. Cas. Eq. [556] and notes; 2 Pom. Eq. Jur. §§ 961, 962. Substantially the same rules are applied to the case of an ex-guardian, where, notwithstanding the termination of the formal fiduciary relation between him and his ward, he still retains his dominion in fact and his position of influence as respects the ward or his property. This is especially true where the donations called in question are made while (even after his majority) the ward continues to reside with the ex-guardian, or the ex-guardian continues to retain possession or control of the ward's property. *Hylton* v. *Hylton, supra; Hatch* v. *Hatch, supra; Pierse* v. *Waring*, 1 P. Wms. 121, note; 1 Story, Eq. Jur. § 317; 2 Pom. Eq. Jur. § 961. In all these cases where the law infers from the relations of the parties the probability of undue influence on the part of the party having dominion or ascendency over another, it requires that the influence in fact exercised shall be exerted for the benefit of the person subject to it, and not for the benefit of the party possessing it, otherwise the donations will be promptly set aside. *Hoghton* v. *Hoghton, supra; Cooke* v. *Lamotte*, 15 Beav. 234. These principles govern the case at bar, and uphold the conclusions of law found by the trial court.

The defendant sustained a double relation to the plaintiff: *First*, the confidential relation of parent; *second*, the fiduciary relation of guardian. The plaintiff resided with the defendant as a member of her family, and under her habitual influence and control at the time of the transactions of October 18, 1876, when plaintiff was a little over 20 years old, and up to September, 1877. The agreement of June 26, 1877, was executed by plaintiff, and on her part performed, while she was a member of defendant's family, wholly dependent upon her for support, and under her habitual influence and control, and while she held in her possession and control the entire property which plaintiff had inherited from her father, and had bestowed upon her as a pure gift, unsupported by any consideration. In fact, with the exception

of her momentary possession of the check before mentioned, the plaintiff never had any possession or control of any part of her inheritance until after the execution and performance of the agreement of June 26, 1877. By that agreement the transactions of October 18, 1876, were overhauled, and a portion of the plaintiff's inheritance restored to her; but nevertheless defendant retained, took, and held a considerable part thereof, of the value of several thousand dollars, in addition to the check of $6,482.95, all for no consideration other than the release of a dower right of the value of $2,000. That the transaction of October 18, 1876, was a "righteous" one, and ought ever to have been consummated or be permitted to stand, is hardly claimed. That it ought to be set aside is manifest upon the plainest principles of equity.

The substance of the finding of the court (heretofore recited at length) is that the agreement of June 26, 1877, was made and consummated when the plaintiff was a member of defendant's family, wholly dependent on her for support, and under her habitual control; that in executing the same plaintiff was not a free agent, but that she executed it without full knowledge or appreciation of her rights, and under the influence of fear of her mother, in hope of restoring pleasant relations with her, and in the apprehension (in view of the transactions of October 18, 1876) that unless a settlement was then effected she would never regain her rights, but would remain pecuniarily dependent upon her mother. Upon the findings the case is, then, one of a parent and ex-guardian retaining and having dominion and ascendency over the child and ward, and her property, who for a grossly inadequate consideration—in effect, largely by gift—has obtained a considerable portion of the property of the child and ward. So far from defendant's successfully bearing the burden of showing that the transaction was a "righteous" one, that it was the free act of the donor, accomplished with a full knowledge of her rights and of all the material facts, and so far from any rebuttal of the presumptions (before spoken of) against its validity, (in view of its attending circumstances,) it appears that the execution of the agreement was brought about by the influence of the defendant, exerted, not for the advantage of the plaintiff, but for the defendant's own benefit. The

contrary of this has been well said to be an "inseparable condition" of the validity of such a transaction. *Hoghton* v. *Hoghton, supra.*

Upon the findings of fact, the case is clearly one of the use of undue influence by the plaintiff in obtaining that which she ought not to have, and should not be permitted to retain. The facts hardly present the case of a family settlement, such as are referred to by defendant's counsel. There was no dispute as to legitimacy,—no ground for any controversy or difference of opinion as to the plaintiff's rights as her father's heir. These latter were explicitly and definitely fixed by statute. Nor was there any family settlement, or attempt at one, in the sense of making provision for other members of the family, defendant excepted. See *Chambers* v. *Crabbe,* 34 Beav. 457; 1 Story, Eq. Jur. § 309*a.*

Defendant's counsel have laid much stress upon the fact, as they claim it, that defendant, in the transaction of June, 1877, had the benefit of competent and independent advice. The court has found the fact otherwise, and we are not prepared to say that the finding is not sustained by the testimony. But if this were not so, and the fact was that the plaintiff had competent and independent advice in the premises, the question would still remain whether, she and her property being under the dominion and control of the defendant, the plaintiff acted under the advice, or under influence of the defendant unduly and improperly exerted for her own advantage. An analogous remark would be applicable to plaintiff's knowledge and appreciation of her rights, and of what she was doing. As remarked by Lord Eldon, (p. 300,) the crucial question in cases of this kind "is not whether she knew what she was doing, had done, or proposed to do, but how the intention was produced; whether all that care and prudence was placed around her, as against those who advised her, which, from their situation and relation with respect to her, they were bound to exert in her behalf." *Huguenin* v. *Baseley,* 14 Ves. 273; *Hoghton* v. *Hoghton, supra.*

This is all that we deem it necessary to say about the case, or the numerous points made and discussed by counsel.

The order refusing to vacate the decision below and to grant a new trial is affirmed.