### HOLT v. GUERGUIN et al.

(Court of Civil Appeals of Texas. San Antonio. April 10, 1913. Rehearing Denied May 7, 1913.)

1. APPEAL AND ERROR (§ 877*)—HARMLESS ERROR—RULINGS NOT AFFECTING RESULT.

A proponent of a will, contested on the ground of testamentary incapacity and undue influence, who is also a defendant in a suit, consolidated with the will contest, to set aside a deed executed by testatrix and her husband and to recover personal property may not complain of the fact that a party disclaimed in open court as to all interest in the estate, on the ground that an interest in an estate may not be relinquished in such manner; the disclaimer not depriving proponent of any interest in the estate.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3560–3572; Dec. Dig. § 877.*]

2. APPEAL AND ERROR (§ 742*)—ASSIGNMENTS OF ERROR—SUFFICIENCY.

An assignment of error complaining of testimony objected to will not be considered, where it is not followed by an intelligible statement, and one which does not indicate what effect the testimony had on any issue in the case; for the court need not seek for the possible effects to consider the assignment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. § 742.*]

3. EVIDENCE (§ 271*)—ADMISSIBILITY—SELF-SERVING DECLARATIONS.

In a proceeding for the probate of a will, contested on the ground of testamentary incapacity and undue influence, consolidated with a suit to set aside a deed executed by testatrix and her husband, and to recover personal property, the testimony of the husband of proponent of the will, who is a defendant in the suits to set aside the deed, as to what he told a third person, not in the presence of testatrix's husband, as to what the latter meant by having papers fixed up right away, or as soon as possible, before it was too late, was properly excluded as self-serving.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1068–1079, 1081–1104; Dec. Dig. § 271.*]

4. WILLS (§ 155*)—UNDUE INFLUENCE—NATURE.

The undue influence which will vitiate a will must be exercised at the time of the making of the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*]

---

**5. WILLS (§ 332*)—"UNDUE INFLUENCE"—IN-STRUCTIONS.**

A charge, submitting the question as to whether a testatrix was under undue influence "at or before the time of the execution of the will" to such an extent as to induce her to make a disposition different from what she would have made had she been left free, correctly defined "undue influence" at the very time of the execution of the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 785; Dec. Dig. § 332.*

For other definitions, see Words and Phrases, vol. 8, pp. 7166–7172.]

**6. DEEDS (§ 211*)—WILLS (§ 55*)—MENTAL IN-CAPACITY.**

Evidence *held* to show that one making a will and a deed did not possess sufficient mental capacity.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 637–647; Dec. Dig. § 211;* Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

**7. DEEDS (§ 211*)—WILLS (§ 166*)—UNDUE INFLUENCE—EVIDENCE.**

Evidence *held* to show that a deed and will were procured by undue influence.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 637–647; Dec. Dig. § 211;* Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

**8. WILLS (§ 166*)—UNDUE INFLUENCE—EVIDENCE.**

The existence of undue influence vitiating a will may be proved by circumstantial evidence, such as the condition of testator's mind, his age, weakness, and infirmity, his surroundings and the circumstances attending the making of the will, the opportunity for the exertion of undue influence, the words and acts of testator and the beneficiary, the existence of confidential relations between them, and the unnatural character of the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

**9. DEEDS (§ 203*)—WILLS (§§ 53, 164*)—UNDUE INFLUENCE—MENTAL INCAPACITY—EVIDENCE—ADMISSIBILITY.**

In a suit for the probate of a will disinheriting an insane son of testatrix, and to set aside a deed executed by testatrix and her husband, on the ground of undue influence and mental incapacity, evidence that about five years before the making of the will and deed the husband gave directions for the disposition of the property showing that he did not wish to disinherit the son was admissible.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 602, 604–611; Dec. Dig. § 203;* Wills, Cent. Dig. §§ 111, 112, 120–130, 403–414; Dec. Dig. §§ 53, 164.*]

**10. APPEAL AND ERROR (§ 742*) — ASSIGNMENTS OF ERROR—REVIEW.**

An assignment of error will be overruled, where the statement under it is so imperfect that no information can be obtained from it.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. § 742.*]

**11. WILLS (§ 374*)—PROBATE—JURISDICTION OF DISTRICT COURT ON APPEAL.**

The district court, on appeal from the county court in proceedings for the probate of a will, tries the case de novo, and may probate the will or declare it void.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 840; Dec. Dig. § 374.*]

Appeal from District Court, Bexar County; J. L. Camp, Judge.

Consolidated suits by Adeline Guerguin Holt for the probate of the will of Mrs. Manuela Morales Guerguin, deceased, in which Leopold Guerguin and others appeared as contestants, and, by Mrs. Annie Guerguin, as next friend of Leopold Guerguin, and others against Adeline Guerguin Holt to set aside a deed executed by testatrix and her husband, and for the recovery of personal property. From a judgment annulling the will and canceling the deed and for the value of the personal property, Adeline Guerguin Holt appeals. Affirmed.

Joseph Ryan, J. G. Griner, and C. C. Clamp, all of San Antonio, for appellant. Carlos Bee, Henry Stieler, and Webb & Goeth, all of San Antonio, for appellees.

FLY, C. J. Appellant sought to probate the will of Mrs. Manuela Morales Guerguin in the county court, and a contest was filed by Mrs. Annie Guerguin, as next friend of her husband, Leopold Guerguin, a person of unsound mind, on the ground of the mental condition of testatrix at the time the will was executed, October 6, 1910, by reason of the fact that the will was not executed as required by law, of undue influence over testatrix by appellant, and of fraud perpetrated by her. On October 16, 1911, Carlos Guerguin, a minor, and Edna Guerguin Hill, joined by her husband, O. A. Hill, children of Leopold Guerguin, intervened in the contest, adopting the pleadings of Annie Guerguin. The will was admitted to probate by the county court, and the cause was appealed to the district court. Prior to that time Annie Guerguin, as next friend of Leopold Guerguin, had filed two suits against appellant, one to set aside a deed executed by Charles Guerguin and Manuela Morales Guerguin, parents of Leopold Guerguin and appellant, in which they had conveyed to appellant all the property they owned, as well as certain lots belonging to Leopold Guerguin; the other suit being to recover certain jewelry and other personal property. When the will contest reached the district court, the three suits were consolidated by agreement. Edna Hill, joined by her husband, for herself and her minor brother, Carlos Guerguin, filed an amended pleading, in which it was alleged that Leopold Guerguin had died pending the suit, and that Edna Hill and Carlos Guerguin were his surviving children and only heirs at law; that Charles Guerguin, the father of Leopold, died on May 11, 1911, and Manuela Morales Guerguin, his wife, and mother of Leopold Guerguin, died on April 30, 1911, and that they at the time of their death owned the property in controversy, situated in San Antonio, and 237,135 acres of land in Mexico. It was alleged that on or about October 6, 1910, Adeline Guerguin Holt, her husband, D. T. Holt, J. G. Griner, and W. L. Frame entered into a conspiracy to deprive Leopold Guerguin, their insane father, of his share of his parents' estate, and in pursu-

ance of the conspiracy caused Manuela Morales Guerguin to execute the document purporting to be her last will and testament, whereby all the property of the estate was bequeathed to Adeline Guerguin Holt; that at said time the purported testatrix was of unsound mind, without capacity to understand the effect of the instrument she was executing, and the property she was devising, or her relation to her son; that the property sought to be devised was of the probable value of $500,000; that Manuela Morales Guerguin at the time was about 75 years of age, and was mentally and physically weak and infirm, and was a bedridden invalid and paralytic, and executed the will under the influence and by the fraud and trickery of the conspirators named; that Charles Guerguin was weak physically and mentally, and helpless and infirm; and that he and his wife, Manuela, were under the control, custody, and influence of appellant and wholly unable to exercise their own will. It was further alleged that on the day succeeding the execution of the will by Manuela Morales Guerguin she and her husband, Charles Guerguin, were induced, through the fraud, trickery, and undue influence of the conspirators, to execute a deed to the whole of their property, real and personal, to appellant; that Charles Guerguin, at the time, was nearly 90 years old, was blind and nearly completely deaf; that he and his wife were rapidly approaching dissolution, were suffering from Bright's disease and hardening of the arteries, and in a condition of senility that rendered them incapable of understanding the nature of the transactions into which they were led by the conspirators. It was also alleged that the deed was concealed until after the death of Charles and Manuela Guerguin. Each and every allegation of the petition was specially traversed by appellant. The cause was tried by jury on special issues submitted by the court, and on the answers thereto judgment was rendered annulling the will of Manuela Morales Guerguin, canceling the deed made by Charles Guerguin and Manuela Morales Guerguin to appellant, dated October 7, 1910, canceling a deed made by Manuela Morales Guerguin and Carlos Guerguin to appellant; that appellees recover from appellant lots 4, 5, and 6, block 8, new city block 972, in San Antonio, Tex., being the homestead of Mrs. Annie Guerguin and appellees; that appellees recover one-half the property of the estate in Texas and Mexico; that they recover $835, being the value of certain personal property; and that they recover from appellant $10,476.54, with interest. Commissioners were appointed to appraise the real property, which was undivided, and apportion appellant a one-half interest in the same, and that the other moiety be apportioned, one half of it to Edna Hill, and the other half to Carlos Guerguin.

[1] We fail to comprehend what injurious effect the statement of Mrs. Annie Guerguin that she waived all interest in the estate could have had upon the rights of appellant. Appellant does not claim that any injury resulted, but merely states the abstract proposition that Mrs. Guerguin owned an interest in the estate which she could not relinquish in the manner she did. The bill of exception shows that Mrs. Guerguin disclaimed, in open court, as to all interest in the estate, and it is stated that the disclaimer would be reduced to writing. The disclaimer did not deprive appellant of a dollar in the estate. The purported assignment of error is really not one, and should not be considered. It is not followed by any statement whatever.

[2] The second assignment of error is not followed by an intelligible statement, and does not indicate what effect, if any, the criticised testimony had on any issue in the case. It is not the province or the duty of an appellate court to seek for the possible effects that testimony objected to may have had upon the issues, but that should be clearly and succinctly pointed out in the brief. We cannot ascertain why Frame's connection with the Eureka Gold Mining Company could arouse the animosity or prejudice of the jury against appellant. The same objections obtain as to the third, fourth, and fifth assignments of error. Neither is followed by a statement, and it is not apparent in what manner the matters of which complaint is made could have affected appellant's case.

[3] The sixth assignment of error is not followed by a statement, but as it contains a statement in itself that indicates somewhat the matter of which complaint is made it is considered. The evidence of what Holt, the husband of appellant, told Nelson, not in the presence of Charles Guerguin, as to what the latter meant by having "papers fixed up right away, or as soon as possible, before it was too late," was properly excluded. The evidence was self-serving, and may have been a part of the alleged conspiracy to obtain the will and deed from the old people. The cases cited have no bearing upon the question sought to be raised.

[4, 5] The seventh assignment of error is not followed by any statement. It is considered, however, because it contains the question which is assailed by it. The only proposition is that the undue influence must have been in operation at the time of the execution of the will. The qualification of the question as to Mrs. Manuela Guerguin being under the influence of Mrs. Holt "at or before the time of execution of the will" by the words, "to such an extent that it induced the said Mrs. Manuela Morales Guerguin to act contrary to and to make a different disposition of her property, by the terms of said will, from what she would have made had she been left free," relieved the charge of any ground for criticism. No matter when the influence began, if it continued

up to the time of the publishing of the will and caused the testatrix "to act contrary to her own wishes," her act was not a voluntary one and the will was not hers in law. The influence must be exercised at the time of the making, and the charge fully covered the law in that respect. Not only that, but a special charge asked by appellant and given by the court intensified and emphasized the law as to undue influence. The jury could not have done otherwise, under the evidence and the charge, than find that the will was the outcome of undue influence upon the testatrix, not only before, but at the very time of, the execution of the will. These conclusions dispose of the eighth, ninth, and tenth assignments, which are like unto the seventh.

[6, 7] Our conclusions as to the facts dispose of the eleventh, twelfth, thirteenth, fourteenth, fifteenth, sixteenth, and seventeenth assignments of error. The only witness who swore that Mrs. Manuela Morales Guerguin had the will explained to her and fully understood it was the attorney who wrote it, and he was impeached by a number of reputable witnesses. Even the physicians offered by appellant testified to the decrepit, weak condition of the old couple, both mental and physical. Dr. Paschal stated that Charles Guerguin "was blind, and had to be led around and cared for like an infant"; that Mrs. Manuela Guerguin was partially paralized, and had a general weakness of the muscular system; that the old man was in a condition to yield to influence rather than combat it; that he had Bright's disease in an advanced stage as a result of arterial sclerosis; that arterial sclerosis has caused a complete mental overthrow, but it does not always; is capable of it, and frequently causes paralysis, which finds its seat in the brain. Mrs. Guerguin's paralysis began in the early part of 1910. She had Bright's disease and hardening of the blood vessels, which is arterial sclerosis. Her condition was progressive. Dr. Berry admitted that the old people were suffering from senility; that they were suffering from Bright's disease and arterial sclerosis, which have a tendency to cause unsoundness of mind. He testified: "Arterial sclerosis is a progressive and incurable disease culminating in dissolution. It is a weakening disease of the organs and functions of the body, but has its effect on the system generally. It weakens the entire system, and generally the brain powers and forces, and its general effect is to diminish the resisting powers of a person and render them less aggressive and more passive. * * * Yes; I would say that it is ordinarily correct, as a rule, that a person, say, 75 years of age, paralyzed, in an advanced state of Bright's disease, emaciated, bedridden, with arterial sclerosis, would be in a condition where there would not be much resistance to influence that would be brought to bear on them." There was evidence tending to show that the two old people were utterly incapable of attending to any business; that appellant would not let them sell a lot; denied more money to her afflicted brother, Leopold, who had spent his life working in the interest of her father's estate, and had lost his mind; that she had attempted to cast doubts upon the paternity of her brother's children; that her parents often spoke of her brother, and had great affection for them. Leopold Guerguin was industrious and economical, and conducted his father's business until he lost his mind in 1909. Mrs. Manuela Morales Guerguin died in 1911, and was about 76 years old when she died. The aged couple lived in the same house with appellant and her husband, and the attorney who was employed to draw the will and write the deed on October 6 and 7, 1910, was a man never employed by the aged couple; their former attorney being passed over for one chosen and selected by the husband of appellant. The will was witnessed by the attorney and his stenographer. The husband of appellant was a business associate of the attorney who prepared the will and deeds. The old people did not know him. The uncontroverted evidence showed that Charles and Manuela Morales Guerguin had the most affectionate feelings for their son, Leopold, and at all times expressed solicitude for his welfare, and yet they pauperized themselves, disinherited their only son, and gave everything—a vast fortune—to their daughter, the appellant. The testimony was sufficient to sustain the findings of the jury and the judgment of the court, not only on the ground of the incapacity of the aged couple to convey their property, but on the ground of undue influence.

[8] The existence of undue influence is a question of fact, and from its very nature, like all fraudulent and vicious schemes, hides its features behind masks and operates in dark and secret places and in covert ways, and proof of it must usually be by circumstantial rather than by direct testimony. Those circumstances may be the condition of the testator's mind, his age, weakness, and infirmity, his surroundings and the circumstances attending the execution of the will, the opportunity for the exertion of such influence as would trammel or destroy the exercise of free agency in the disposition of the property, the words and acts of testator and beneficiary, the existence of confidential relations between them, and the injustice, unreasonable and unnatural character, of the will. Rollwagon v. Rollwagon, 63 N. Y. 504; Woodbury v. Woodbury, 141 Mass. 329, 5 N. E. 275, 55 Am. Rep. 479; Bryant v. Pierce, 95 Wis. 331, 70 N. W. 297; In re Barney, 70 Vt. 352, 40 Atl. 1027; Marx v. McGlynn, 88 N. Y. 357; Smith v. Smith, 60 Wis. 329, 19 N. W. 47.

In the case of Ashton v. Thompson, 32 Minn. 25, 18 N. W. 918, the Supreme Court

of Minnesota said: "Upon grounds of public policy, or, as it is otherwise expressed, of public utility, equity exercises a salutary jurisdiction in setting aside donations of property made to a donee who stands in some confidential or fiduciary relation to the donor." Such relationship would not be sufficient, standing alone, to render void a conveyance, but when coupled with such potent circumstances as the marked influence shown to have been exerted by the beneficiary in this case, the opportunity and temptation to influence, the unnatural disinheritance of an afflicted son, who had been loyal and dutiful, the affection the aged couple expressed for him, their enfeebled condition of mind and body, the officious control of the property of the parents by appellant, her slander of her brother's children, it is ample to sustain the verdict. When the will and deed were executed, no old friend was called in as a witness, no old legal adviser was requested to draw the instruments, but the attorney and the man who witnessed with him were strangers and in their hands was left the disposition of half a million dollars worth of property.

As said by the Supreme Court of Massachusetts in Woodbury v. Woodbury, 141 Mass. 329, 5 N. E. 275, 55 Am. Rep. 479: "It is often difficult to show by direct proof the undue influence, and direct evidence of the actual exercise of such influence can hardly be expected. Oftentimes the means of keeping the influence out of sight are many and easy of application, and yet the result may be clearly apparent. Delafield v. Parish, 25 N. Y. 9. The fact of the influence exerted is more often gathered from all the circumstances surrounding the donor, his health, age, and mental condition, how far he was dependent upon and subject to the control of the person benefited, the opportunity which he had to exercise his influence, and the disposition of the donor to be subject to it. In addition, the fact of influence by the donee over the donor having been established, it is not necessary to show by absolute evidence that this was exercised by the donee at the time the gift was made. Undue influence must be exercised in relation to the gift made, and not as to other transactions, in order to invalidate a gift thus obtained. But if the jury find from the evidence that, at or about the time when the gift was made, the alleged donor was, in other important particulars, so under the influence of the person receiving the gift, that, as to them, he was not a free agent, but was acting under undue influence, the circumstances may be such as fairly to warrant the conclusion, from the absence of any evidence bearing directly upon acts done when the alleged gift was actually made, that in relation to that also the same undue influence was exerted." That doctrine need not be invoked in this case, however, for the suspicious circum-

stances followed the lives of the aged couple to the very time of the execution of the will, deed, and other instruments, and cry out against the whole transaction as illegal, fraudulent, and unnatural.

It is insisted that a moving cause for the execution of the instruments which stripped the insane son of any inheritance in property that he had devoted his life to enhancing in value, and robbed the minor grandchildren (the only ones, by the way) of any part in the estate, was caused by the hatred of the aged couple to their daughter-in-law, but how easy it would have been to have devised the property so that she could not have reached it, and, even if the insane father had been deprived of it, to have given something to the minor grandchildren. The legal adviser and doubtless the appellant knew that, but it was not suggested. According to the testimony of the mother of appellees, the old people did not entertain any animosity to her, but invited her to call on them, which she was not permitted to do by appellant. The wife was even deprived of the privilege of seeing her husband by appellant, after he was taken to his parents' home. After the husband left for the asylum, Mrs. Guerguin was denied admittance to the presence of her parents-in-law; the reason given by appellant being that they were sick and would cry. The minor appellee, Carlos Guerguin, was his grandfather's namesake, and had been so named by his grandmother. He was the only grandson, and yet by the instruments under which appellant claims the property he was totally disinherited and his paternity and that of his sister questioned by the beneficiary in the instruments, the appellant herein.

[9] The directions given by Charles Guerguin to his wife five years or more before the disposition of the property was made, which is herein in controversy, clearly show that he did not wish to disinherit his son, but wanted him to have one-half the property. If he desired to deprive his daughter-in-law of any interest in the estate, he could have done so without depriving the son and grandchildren of all interest in the estate. Those directions anyway merely showed the state of his mind long before the will, deed, and other instruments were executed, and there was evidence tending to show that it did not exist in 1910.

[10] The statement under the eighteenth assignment of error is so imperfect and obscure that no information can be obtained from it, and the assignment is overruled. The assignment in the brief is different from that in the record.

[11] The nineteenth assignment of error is overruled. When the case involving the probate of the will was appealed to the district court, that tribunal tried the cause de novo, and had the authority to probate the will or declare it null and void. There is no ruling

to the contrary in the case of Buckner v. Wait, 137 S. W. 383, cited by appellant. In that case it was held that the district court could not, in an original proceeding, interfere with the administration of an estate in the county court; but it was not held that the district court did not have the authority to try a probate case appealed from the county court, and to render a different judgment from that rendered in the county court. Such holding would be in the face of the Constitution and laws of the state. R. S. 1911, art. 1706.

The twentieth and twenty-first assignments of error are not followed by statements casting any light on them, and they are overruled.

The case of Salinas v. Garcia, 135 S. W. 590, decided by this court, is invoked as being applicable to the facts in this case, but the facts in that case are not similar to the facts in this. The will in the Salinas Case was drawn by a man who was an old friend to the testatrix, who was well and favorably known throughout Texas, and who was wholly unprejudiced. The will was in favor of her sons, who had cared for their mother and attended to her business, and there was no evidence of undue influence. Every case must be tested by its peculiar facts; and, while the law as expressed in the cited case is the law at all times, it must have facts to which it can be applied. This court has consistently thrown about the wills of aged persons every safeguard and protection vouchsafed by law and supported by facts, but it cannot set aside a judgment annulling a will, where the verdict upon which it is based is as well sustained as in this case.

The judgment is affirmed.