EDWIN C. SHEVLIN v. THOMAS H. SHEVLIN.[1]

December 15, 1905.

Nos. 14,389—(8).

**Contract—Fraud.**

In a proceeding to set aside a contract made by a younger with his elder brother on the ground of fraud and duress, the findings of the trial court are entitled to the recognized presumption in their favor. The plaintiff can prevail only upon the facts which are so found, or are essentially uncontradicted, or stand admitted upon the pleadings.

**Abuse of Confidence.**

Where confidence is reposed by one brother in another, and that confidence is abused by the brother having it in his power, for his own advantage, to sacrifice those interests which he is bound to protect, he will not be permitted to retain any undue advantage he may have gained.

**Relation between Brothers.**

There is no presumption of fiduciary relations between brothers, especially where both of them are of mature years and have had experience in the matters of business as to which fraud is alleged. The fact that such confidential relation existed must be affirmatively established by proof. The burden of proof rests upon the party asserting it.

**Same.**

Upon the substantially admitted facts in this case it is *held* that the elder brother sustained a quasi paternal relation to his younger brother, especially in view of that younger brother's extreme weakness, though falling short of incapacity, arising from habitual indulgence in intoxicating liquors.

**Undue Influence.**

The facts in this case show that the younger brother did not have full or accurate knowledge of the value of the stock constituting his whole

1 Reported in 105 N. W. 257.

fortune, which he sold to his brother, and that the elder brother, to secure such transfer, exercised an undue influence over the younger.

**Burden of Proof.**

The relation existing between the parties, the younger brother's financial situation and physical and mental condition at the time of transfer, his knowledge of the value of the stock he transferred, and the elder brother's own version of the exercise of his influence, showed that the parties did not deal on equal terms or at arm's length, and threw on the defendant the burden of establishing that no undue advantage had been taken by him.

**Same.**

The elder brother did not in this case bear the burden of showing that the consideration of the transfer was adequate and equitable. The actual consideration was $70,000. The answer alleged at one place that the stock was not worth more than $140,000 upon a speculative basis. The trial court found that it was worth $95,000.

**Ratification.**

The trial court was not justified by the testimony in finding that the younger brother, when mentally sound and fully competent, and with full and accurate knowledge of all the facts relative thereto, ratified the sale of stock to the elder brother.

**Same.**

To establish a ratification it must be shown that the person ratifying acted with full knowledge of all material particulars and circumstances. Imperfect and incomplete information is not sufficient.

**Disaffirmance.**

The wrongdoer cannot make extreme vigilance and promptitude conditions of the affirmative disapproval of pecuniary transactions by the party wronged.

**Estoppel.**

Mere submission to an injury after the act inflicting it is completed cannot generally, and in the absence of other circumstances, take away a right of action, unless such acquiescence continues for the period limited by the statute for the enforcement of such right.

**Relief.**

The only relief which this court can grant the younger brother in this case is to reverse the judgment appealed from.

Action in the district court for Hennepin county to set aside a sale and transfer of certain shares of stock by plaintiff to defendant, on the ground of fraud and duress. The case was tried before Simpson, J.,

who found in favor of defendant. From a judgment entered pursuant to the findings, plaintiff appealed. Reversed, and new trial granted.

*A. B. Jackson,* for appellant.

*Lancaster & McGee* and *A. Y. Merrill,* for respondent.

JAGGARD, J.

The appellant and plaintiff, Edwin C. Shevlin, brought this action against his brother, the defendant and respondent, Thomas H. Shevlin, to declare void and to cancel a certain transfer of stock made by the plaintiff to the defendant and the contract executed in connection with it.

In Albany, New York, defendant was born on January 3, 1852; plaintiff, on June 8, 1867. When the younger brother was two or three years of age he received a severe injury to his skull, which to an undetermined extent influenced his subsequent development and history. He became, however, a hearty boy. On January 1, 1880, defendant went into the employ of S. C. Hall, as manager of his lumber business at Muskegon, Michigan. Four years later plaintiff followed him, and went to work for the same lumber company. In 1885 defendant came to Minneapolis and became general manager of the Hall & Ducey Lumber Company. Plaintiff followed the year later, and was employed by the same concern. In 1882 defendant married a daughter of S. C. Hall; in 1895 plaintiff married another daughter of the same person. Plaintiff made his home with his brother until his marriage. He was a bright, active, energetic, and successful salesman. While he was on the road, he was somewhat given to drinking, became to some extent "sporty," and accumulated nothing. Shortly after his marriage he kept house in Minneapolis and maintained intimate and friendly relations with his brother and his brother's family. His drinking increased. In 1896 he took the Keeley cure, and refrained from drinking for about a year. In March, 1898, he took the Keeley cure a second time.

At the time of Edwin's marriage Thomas gave him as a wedding present twenty shares of stock, of the par value of $2,000, in the J. Neils Lumber Company, organized in February, 1895. In June, 1897, Thomas agreed to sell Edwin, who was then in the employ of the Shevlin-Carpenter Company, seventy shares of stock in the J. Neils Company for $6,000, which the court found to be worth over $13,000, book value, and to take his note for it, with interest at six per cent.

In 1896 the St. Hilaire Lumber Company was organized by experienced lumbermen. The capital stock was $20,000, divided into two thousand shares. Of these Thomas Shevlin took seven hundred shares; the Hixons, eight hundred shares; the Arpins, four hundred shares; and Hovey C. Clarke, one hundred shares. This company bought up some standing timber and started a mill at St. Hilaire, Minnesota. In January, 1898, Thomas Shevlin and the Hixons organized the Crookston Lumber Company, with the capital stock of $100,000, divided into one thousand shares. Of this Thomas Shevlin took three hundred and fifty shares; the Hixons, five hundred shares; Edwin C. Shevlin, one hundred shares; and Hovey C. Clarke, fifty shares. Edwin, to pay for his stock, gave his note to Thomas for $10,000, with interest at seven per cent. He was made general manager of the Crookston and St. Hilaire Lumber Companies. In September, 1898, Thomas purchased half of the holdings of the Arpins in the St. Hilaire Company (two hundred shares) for the purchase price of $25,000. The Hixons purchased the balance of the Arpin holdings (two hundred shares) at the same time and for the same price. In June, 1899, Thomas agreed with Edwin to give him two hundred shares in the St. Hilaire Lumber Company for the ninety shares of the J. Neils Lumber Company stock then held by him. This agreement was carried into execution June 12, 1899. The value of the stock was such that the exchange was found to be in all respects just, fair, and equitable. As a result of these transactions Thomas and Edwin Shevlin, the Hixons, and Clarke owned all the stock in the Crookston and St. Hilaire Companies in the proportions aforesaid. From that time forward the two companies were practically consolidated and operated as one, generally known as the "Crookston Lumber Company." On June 12, 1899, the balance due on the $10,000 note which Edwin gave for the purchase of his interest in the Crookston Lumber Company and of the J. Neils Lumber Company stock amounted to $17,565.09.

The answer alleges, and some of the testimony tends to show, that during the time Edwin was general manager, between March 1, 1898, and January 6, 1900, he indulged in the excessive use of intoxicating liquors, and was on frequent occasions wholly incapacitated to perform his duties, or any of his duties, as such general manager, by reason of his intoxicated condition; that his habits became so bad in

this respect that he was wholly unfit to conduct the business of the said Crookston Lumber Company, or any other business; and that in the month of December, 1899, on account of his drinking habits and his inability in consequence thereof to properly attend to the business of the said Crookston Lumber Company, this defendant's associates in said company complained repeatedly and properly to this defendant, and urgently requested and insisted that this plaintiff be removed as general manager. Thomas spoke to Edwin and his wife on this subject, and warned them both that Edwin would not be permitted to remain as manager of the lumber companies at Crookston if he persisted in his drinking. Early in December, 1899, Edwin had another drinking spell, and just as he was recovering from it, and on or about December 7 or 8, 1899, Thomas went to Crookston, and told Edwin, to the knowledge of his wife, that Edwin must resign. Both Edwin and his wife insisted that his drinking had not interfered with his management of the company, and protested against compulsory resignation. The court found that the defendant was in all respects fully justified in requesting the resignation of the plaintiff, and that the defendant acted in good faith toward the plaintiff in so requesting and advising his resignation. On December 11, 1899, Edwin tendered his resignation. He remained at Crookston, closing the business for 1899 and making up the inventories.

The history of the transactions now approaches the period of the transfer of the stock under the agreement which is sought to be set aside. While Thomas was in Crookston demanding Edwin's resignation, Edwin's wife asked him, in effect, whether it would be necessary for Edwin to transfer his stock. He told her that it would not be. According to his own testimony, however, that was not what he thought at that time. The reason for this misstatement was a deep-rooted disinclination to transact business with women. He had the idea of securing the transfer of the stock in his mind all the time after Edwin resigned. On January 5 or 6, according to defendant's final testimony, Edwin and his wife, at defendant's invitation, came to Minneapolis and stayed at his house as his guests. During the visit the plaintiff and his family were by the defendant treated with the utmost consideration, courtesy, and kindness, and the friendliest relations existed between plaintiff and his family and defendant and his family.

A material question concerns the time of fixing the price to be paid for the stock. If that time was January 5 or 6, the date at which defendant contends there was a preliminary conversation concerning the sale and price to be paid, the testimony fails to show the immediate intoxication of plaintiff; if that time be January 15, it is unquestioned that he was just emerging from a desperate spree. The significance of that date is also increased by the contention of defendant that the sale and consideration were then agreed upon, and by the opposed contention of plaintiff that, according to the answer and defendant's own testimony, the consideration was not then determined, but was left to ascertainment by Thomas, and that Thomas first advised his brother of the value of the stock on January 15. The answer elaborately sets forth that, at the preliminary conversation, Thomas urged upon his brother the unfairness of the retention ·of the stock and the duty of transferring to him at a fair value to be agreed upon; that Edwin assented to this; that Thomas agreed to consider the matter further, and decide upon what he thought would be a fair price to be so agreed upon; that subsequently, and before January 15, Thomas did consider the matter of price to be agreed upon, consulted the financial statements of the companies, and ascertained the book value of said stock to be approximately $62,700; and that, immediately prior to or on January 15, he stated the price agreed upon as $70,000. On trial Thomas insisted that at the preliminary conversation he had some pencil memoranda which showed the entire assets of the companies, and that he and his brother looked at the footings and saw what the profits were; he denied his agreement to ascertain the value of the stock, his examination as to such value pursuant to any such agreement, and that Edwin was advised for the first time of the price determined on on January 15; and he asserted that Edwin was so apprised at the preliminary conversation, on or about January 5 or 6. When confronted by the inconsistencies between this testimony and the allegations of his answer, he avoided direct replies to proper questions involving these contradictions, equivocated, denied, and finally more or less clearly assented to the statements of the answer. The testimony of Mrs. Thomas Shevlin directly, and that of other witnesses indirectly, sustained the contention of defendant that the price was mentioned during the negotiations. On the other hand, the plaintiff insists that there were no such

prior conversations, and that the sale of the stock was never suggested to him until, and that the price was fixed on, January 15. Taken as a whole, the testimony, including Thomas' own, could not be fairly regarded as overcoming the logical effect of the admissions of the answer.

Commencing on January 10, Edwin began and continued to drink more or less until seven or eight o'clock in the evening of January 12, when he went to bed in his brother's home and did not leave there until Monday morning, January 15, on which day the transfer was signed. The avowed purpose of his staying indoors during Saturday and Sunday was to "sober up." The only whiskey he drank on these days was given to him by his wife for the purpose of "tapering off." On the morning of January 15 defendant entered the bedroom and requested Mrs. Edwin to leave, "as he wished to talk to Eddie." There is difference of recollection between Mr. and Mrs. Thomas Shevlin and Mr. and Mrs. Edwin Shevlin as to just what language was used, but it appears that the wife of Edwin burst into tears and protested against Edwin's selling his stock, and insisted that he was in no condition to think about or engage in so important business. There is direct conflict of testimony also as to Edwin's mental and physical condition on that eventful Monday. According to the testimony of the plaintiff's wife, not susceptible of successful contradiction, about nine o'clock she was at his bedside trying to make him swallow some raw eggs, which she fed him, because his own hands were too tremulous to hold the glass. It is conceded that Edwin got up from bed, and either dressed or was dressed by his wife, and that he and Mr. and Mrs. Thomas Shevlin drove down town in defendant's carriage to the office of the Shevlin-Carpenter Lumber Company. Edwin arrived there about ten o'clock in the forenoon, and remained until nearly noon of that day. There was testimony of persons in the office who knew plaintiff that they noticed nothing unusual about his mental or physical condition. Thomas Shevlin's own narrative of his conversation with his brother when the agreement was made is as follows:

> I said: "Ed, now that you are going to leave this business, I think that it is only fair and right that you should sell back to me this stock which I sold you. When you bought it of me, I sold it with the agreement that you was to come to Crookston and manage and run this business, and relieve me of a great

deal of responsibility. I sold it to you at a very reasonable price with that understanding. Now, you have gone up there and stayed twenty-two months; you have broken your promise to me not to drink; you have gone on and drank, so that these people that are associated with me won't permit you to stay any longer, and I don't want you to stay on account of your conduct." And he said, "That is all right."

Plaintiff thereupon signed an agreement whereby he sold to his brother the two hundred shares of stock in the St. Hilaire Lumber Company and one hundred shares of stock in the Crookston Lumber Company for $70,000, of which $20,000 was paid in cash, and the balance, less plaintiff's indebtedness to defendant, was agreed to be payable on or before five years from date, with interest at six per cent., payable quarterly. That agreement expressly provided that if at any time Edwin desired to engage in business, subject to the approval of Thomas, then Thomas agreed to pay Edwin the balance due him at such time. After the instrument was signed, Edwin returned to his brother's house prostrated. The doctor then sent for found Edwin in bed in a condition of profound nervous collapse and of marked muscular tremor, with a weak pulse and in a cold perspiration. He was mentally confused and suffered from mental apprehension or fear and emotional weakness, accompanied by a tendency to cry upon reference to his condition or its cause. On January 17 and on several subsequent days Edwin was about and around town, doing various errands preparing for his journey to California, for which place he left on January 22. Edwin, with his devotedly faithful wife and his children, went to Europe in the early fall of 1901. Other facts will be stated subsequently in connection with the legal questions involved. The trial court found for the defendant, and refused plaintiff all relief. From the judgment entered plaintiff took this appeal.

The assignments of error, as finally formulated, present the case for decision upon the merits. It is one in which, to a peculiar degree, the findings of fact by the trial court, in whose presence the witnesses were produced, are entitled to the recognized presumption in their favor. The plaintiff can prevail in this court only upon facts which are so found or are essentially uncontroverted or stand admitted by the plead-

ings. Therefore the facts have been stated and will hereafter be considered in substantial accord with the defendant's own account of the relations and transactions of the parties. In this view, also, we are satisfied that the plaintiff, Edwin Shevlin, was not so far mentally incompetent that the assignment of the stock and the contract which he made on January 15, 1900, was not his act (see Perry v. Pearson, 135 Ill. 218, 25 N. E. 636) ; and that the relief in this case should not be based on the ground of actual fraud, deceit, or duress, and undue influence alone (see Bancroft v. Bancroft, 110 Cal. 374, 40 Pac. 488), apart from the peculiar relationship of the parties and from the well-established equitable principles applicable to a violation of the duties imposed by such a relationship.

To defendant's own version of the dealings and relations of the parties, the language of Johnson, J., concurring in Wormley v. Wormley, 8 Wheat. 421, applies mutatis mutandis : "After the most careful examination of this voluminous record, I think it is due to the parties defendant to express the opinion that I cannot discover any evidence of fraud in any part of their transactions. * * * I can see nothing but liberality in the conduct of Strode (the trustee against whom relief was sought) towards Wormley, and little else than improvidence, caprice, and ingratitude in the conduct of the latter. Nevertheless there are canons of the court of equity which have their foundation, not in the actual commission of fraud, but in that hallowed orison, 'Lead us not into temptation.' One of these is that a trustee shall not be permitted to mix up his own affairs with those of the cestui que trust. Those who have examined the workings of the human heart well know that in such cases the party most likely to be imposed upon is the actor himself, if honest, and, if otherwise, that the scope for imposition given to human ingenuity will enable it generally to baffle the utmost sublety of legal investigation. Hence * * * the rule is positive and general that the cestui que trust may be restored to his original rights against the trustee, at his option."

The first question here to be determined is whether or not the transfer of the stock by plaintiff to defendant was made under such circumstances as to entitle plaintiff to the equitable relief here sought.

1. We are of the opinion in this case that Thomas stood in such fiduciary relation to Edwin as to bring him within the rule that where

confidence is reposed, and that confidence is abused by the party having it in his power for his own advantage to sacrifice those interests which he is bound to protect, he shall not be permitted to hold any such advantage; that is to say, in the language of Lord Eldon, so constantly quoted (see Ashton v. Thompson, 32 Minn. 25, 18 N. W. 918; Fischer v. Sperl, 94 Minn. 421, 103 N. W. 502) as to become the very alphabet of this subject: The question is not whether the plaintiff knew what he was doing, had done, or proposed to do, but how the intention was produced; whether all that care and providence was placed round him, as against those who advised him, which from their situation and relation with respect to him they were bound to exercise on his behalf. Huguenin v. Baseley, 14 Ves. Jr. 273, 2 Lead. Cas. Eq. pt. 11, p. 1156. And see Story, Eq. § 309. This principle of equitable jurisprudence is as elementary and as universally agreed upon as the multiplication table. It would be futile to incumber this record with citations or quotations concerning it. This court has repeatedly recognized this class of constructive frauds. It has spoken with no uncertain sound as to the propriety of the doctrine, and has enforced it with unfailing certainty. Ashton v. Thompson, supra; King v. Remington, 36 Minn. 15, 29 N. W. 352; Fischer v. Sperl, supra.

There is no presumption of a fiduciary relation between brothers, especially where both of them are of mature years and have had experience in the matters of business as to which fraud is alleged. The fact that such fiduciary relation existed must be affirmatively established by proof. The burden of proof rests upon the party asserting it. The equitable doctrine, however, has been applied to cases involving the relationship of brother to brother, and equitable relief has been extended to the brother of whom undue advantage was taken in cases in which the circumstances were much less demonstrative of the right to impose confidence and less fraught with breach of duty than are found here. More v. More, 133 Cal. 489, 65 Pac. 1044; Birdsong v. Birdsong, 2 Head. 289, 299.

This plaintiff and defendant did not deal at arm's length. This case is not one to which the rule of caveat emptor applies. On the contrary, the relationship was vastly more intimate, confidential, and dependent than that which normally exists between one brother and another, older by fifteen years. When the elder went into the new country, in which

he was to inaugurate his great success, the younger, a lad of seventeen, came. When the elder changed the scene of his labors, his brother followed him. Thomas fixed his abiding place; there Edwin made his home. When plaintiff needed help, he went to defendant for aid which never failed.

> "Measurably," Thomas says, "from the time he [Edwin] was a boy, he had always depended upon me, and had always received advice, instruction, and help, and direction as to everything concerning his business life and property affairs."

Thomas was the patron, Edwin the pupil, in lumber business. As Thomas advanced from manager to proprietor, his brother remained a subordinate; but his wages grew and his forms of usefulness increased. Without his knowledge he was elected a director of corporations controlled by Thomas and was employed as a "stool pigeon." The fortune Thomas made in a degree Edwin shared. The marriage of the two brothers to two sisters augmented alike their intimacy and the younger's dependency. The benefactions of the elder brother increased in frequency and extent; indeed, that generosity became "overwhelming" beyond plaintiff's ability "to make a proper return." Throughout his struggle with the sin that did so easily beset him, the elder brother's hand was invariably extended. Seeking for self-mastery with the aid of medical treatment, the weaker brother tried to conceal his failures from his more potent benefactor, to whom he owed much and from whom he was encouraged to hope for more. The agreement was executed when the younger brother and his wife were the guests in the home of the elder. "A man of strong and positive character, naturally self-willed, self-reliant, and confident," Edwin was advised and directed in his affairs and largely influenced in his character and life by his trust in and his admiration for the stronger brother's leadership and achievements, mingled with some fear of his brother's crushing force and habit. Thomas was a man as positive and dominant in nature as he was bold and successful in commerce. The habitual attitude of Thomas was that of ascendency; of Edwin, deference. It is not material by what epithet the influence of the elder over his struggling younger brother be described. It amounted to more than advice or direction. It was substantial control. The relationship was quasi parental.

The equitable aspect of this confidential relationship is to be considered in the light of the mental and physical condition of the younger brother at the time of the negotiations leading up to the agreement here sought to be avoided, and of the execution of that instrument. Years of indulgence in drink by this man whose head had been severely injured in infancy, who had twice taken the Keeley cure, and who was either a dipsomaniac or the victim of an unconquerable habit, did not prevent his having lucid intervals between the breaking out of a spree and the time of recovery; but it wrought havoc with his life. The answer alleges that from 1888 to the present time it would have been impossible for the plaintiff to have secured or retained employment with any other person than his brother, because of drinking habits, and that the defendant caused him to be retained in the employment of various companies solely because of his relation to the defendant and interest in his welfare. The plaintiff became incompetent to conduct the business at Crookston, which he had for a while managed so successfully. The defendant realized this so completely as to enforce his resignation. Instead of producing a reaction for reform, that resignation precipitated the weakened man into such a debauch that he was, according to the answer, at times incapable of rational thought or action. When the contract was in fact signed, his condition was pitiable. That he collapsed immediately afterwards is legally significant, as it serves to show how readily his actions could be molded by his forcible and arbitrary brother (see Taylor v. Taylor, 8 How. 183), how unable, under the circumstances, he was to assert independent judgment, and how unfair it was immediately before to have insisted upon his disposition of all his fortune. See Kilgore v. Cross (C. C.) 1 Fed. 578.

That Thomas appreciated his brother's condition and the great responsibility of his own partially fraternal and partially paternal position is shown conclusively by the agreement itself. Thereby Thomas in effect made himself the guardian of his brother's future business undertakings and a trustee to pay him quarterly dividends for five years. "Extreme weakness will raise an almost necessary presumption of imposition, even when it stops short of incapacity; and though a contract in the ordinary course of things reasonably made with such a person might be admitted to stand, yet if it should appear to be of such a nature as that such a person could not be capable of measuring its extent

or importance, its reasonableness, or its value fully and fairly, it cannot be that the law is so much at variance with common sense as to uphold it." Story, J., in Harding v. Wheaton, 2 Mason, 378, Fed Cas. No. 6,051.

2. Edwin had neither accurate nor full knowledge of the value of the stock which he sold, and which constituted his whole fortune. He had both the means of knowledge and in a large measure actual knowledge as to the liabilities of the two companies, and as to the amount and probable value of their assets, excepting only the amount and value of pine stumpage. The answer expressly admits and the testimony shows that the principal property of both companies consisted of such pine lands. A financial statement of 1898 was sent to Edwin on July 11, 1899. Conceding that it contained the amount of timber carried out as in the minute book of the St. Hilaire Company in figures, the cost of the lands, with interest and taxes added, it did not apprise plaintiff of the extent and value of timber held by both companies on January 15, 1900. Thomas himself, as will presently appear, did not rely upon it, but had other memoranda prepared to estimate even book values. The accounts of payments on pine lands were kept at Crookston, where Edwin had access to them, although it seems that one purchase of timber for over $130,000 was not entered thereon until after the sale of stock by Edwin to Thomas was made. Of this property he is not shown to have known anything definite. According to the answer the accounts, records, and plats of the standing timber were in Thomas' own possession, and under his control and supervision, at Minneapolis. These records Edwin never examined, and no knowledge of their contents was sufficiently shown to have come to him. He had a book of colored plats of some pine lands; but it did not avail to advise him of either their full extent or of their value.

In course of trial counsel for the defendant disclaimed that "Edwin Shevlin could have told the number of feet of stumpage or the description of the different items in any of the ledger accounts kept under him. It was neither kept that way; neither was supposed to show the description or the estimated amount of timber." Indeed, the answer in part was:

Defendant specifically denies that he [the defendant] at that time had or has ever had either full or accurate knowledge or

means of knowledge as to the exact quantity or value of all the property of said companies, or of their timber lands or stumpage.

Accordingly, that Thomas talked very frequently with Edwin in regard to the amount of pine lands owned by the companies and of its various purchases, one of which was not consummated, and was always impressing upon him the advisability of increasing pine stumpage holdings, does not serve to attribute knowledge of the value of the pine lands actually purchased to Edwin. Conversations with other persons connected with the companies, in Minneapolis, communicated no precise information. Nor does inference of knowledge on Edwin's part follow from the dubious and contradictory testimony of Thomas himself as to having shown Edwin at the final conversation pencil memoranda of financial statements showing totals of all assets and liabilities, only the footings of which were examined and which were not produced on trial for inspection. Thomas did not remember who made these memoranda. He had no clear and distinct recollection of what the writings contained, and could not reproduce their contents. There is much force in the argument of counsel for plaintiff that if Edwin was a man of such business capacity and experience and with a character so persistent and tenacious as the court finds, and had also so large and accurate a knowledge of the business and of the valuation of the property and was so free from influence by the defendant as defendant's counsel claims, why did he not stand out for at least the full value of the stock, which he did not wish to sell at all, when he was confronted with so eager and determined a buyer? If the plaintiff knew the value to be at least $95,000, when he sold for $70,000, the defendant also knew it, when he bought for the last-named amount. That, in view of the relationship of the parties, invalidates the transaction under all equity decisions.

3. The fact of the exercise of control over Edwin by Thomas during the arrangement for and the signing of the contract affirmatively appears in the defendant's own case. It is certain that Thomas wanted to buy, and that Edwin and his wife did not want to sell, and that Thomas prevailed. To overcome this resistance Thomas appealed to Edwin's sense of fairness and right toward him, and insisted that it would not be just for his brother to continue to own a one-tenth in-

terest in the business, and have the benefit of the fruits of profits from his future ventures in the timber country and his other work. He reproached his enfeebled brother for having allowed whiskey to get hold again and of having made a failure. Knowing that the stock was Edwin's absolute property, he represented his brother's duty to transfer it to him because of his brother's inability to carry out the terms of an agreement without existence in law. He assured Edwin that he thought, and his partner agreed with him in thinking, that $70,000 was a fair value for the stock. Plaintiff sought and received no independent advice. He was at the time a guest in his brother's home. He begged his brother to keep the whole matter from the knowledge of their mother. Mrs. Thomas Shevlin, who conducted herself admirably in these most embarrassing of situations, expressed her regret that "Ed could not keep his stock." The sale was in effect a compulsory sale. What Chief Justice Marshall said in Harding v. Handy, 11 Wheat. 125, applies fittingly: "If these deeds were obtained by the exercise of undue influence over a man whose mind had ceased to be the safe guide of his actions, it is against conscience for him who has obtained them to derive any advantage from them." And see Allore v. Jewell, 94 U. S. 506.

4. The relation existing between the parties, the plaintiff's financial situation and physical and mental condition at the time, and his knowledge of assets and the defendant's own version of the exercise of his influence, make it clear that the parties did not deal "on equal terms" or "at arm's length," as those expressions are used in equity cases, and threw on defendant the burden of establishing that no undue advantage had been taken by him, that no profit was sought or derived by him, but that, on the contrary, the transaction was just and fair and the consideration was adequate and equitable. Davis v. Dean, 66 Wis. 100, 26 N. W. 737; Birdsong v. Birdsong, 2 Head. (Tenn.) 289, 299; More v. More, 133 Cal. 489, 65 Pac. 1044. This conclusion would follow on the defendant's theory that the price was considered at the preliminary consultation about January 5 or 6; for the equitable principles are applied to cases of unfair advantage when negotiations began and the final transactions were agreed to some time before their final consummation. Ludington v. Patton, 111 Wis. 208, 86 N. W. 43; Huguenin v. Baseley, 14 Ves. Jr. 273; Dunn v. Dunn, 42 N. J. Eq. 431,

7 Atl. 842; Ashton v. Thompson, 32 Minn. 25, 18 N. W. 918; Brooks v. Martin, 2 Wall. 70; Taylor v. Taylor, 8 How. 183; Fox v. Mackreth, 1 White & T. Lead. Cas. Eq. pt. 1, p. 188; More v. More, supra. As has been previously held in this case, however, the record does not justify this contention of the defendant. It shows as a whole that Thomas did undertake at this earlier conversation to consider what would be a fair price for the stock, and advised Edwin of his conclusion for the first time on the day when the contract was executed. The case, according-ly, falls within the rule laid down by Lord Thurlow, in Fox v. Mack-reth, supra: "If A. says to B., 'I know the value of the subject, and if you will trust me I will fairly tell you what it is worth,' and A. at the same time knows the value to be double what he represents it to be, this is such an abuse of confidence as shall be relieved against, not because A. is a trustee, but because he stipulated with B. to tell him fairly the value, and he broke that stipulation; and then, to be sure, it makes full as strong a case as that of a trustee."

5. It follows that, unless the defendant sustained the burden of showing that the consideration of the transfer was fair, just, and ade-quate, the transaction must be set aside. That burden he has not borne. The actual consideration was $70,000. The answer alleges, inter alia, that the stock was not worth more than $140,000 upon the speculative basis therein set forth. To that admission and to other estimates may, as counsel for defendant earnestly and justly insists, properly be applied the caution of conscious effort in the estimate of the value of property to exclude from the mind the effect of great increase of value follow-ing the sale. Sullivan v. Pierce, 125 Fed. 104, C. C. A. 148. How-ever, the trial court found that the stock was worth $95,000, and that any sum from $62,500, the book value, to $110,000, might have been considered to be the value of the stock in January, 1900, by a person fitted to make an estimate. Counsel for plaintiff contends, with much show of reason, that upon a fair construction of the record and testi-mony of defendant's own witnesses the value of plaintiff's interest was from $112,503.90 to $286,285.24. We are of opinion that the evi-dence conclusively shows the consideration to have been so grossly in-adequate and to have resulted in so great and unequal an advantage to the vendee as to entitle plaintiff to the relief he seeks.

In Allore v. Jewell, 94 U. S. 506, the court said: "It is not necessary, in order to secure the aid of equity, to prove that the deceased was at the time insane or in such a state of mental imbecility as to render her entirely incapable of executing a valid deed. It is sufficient to show that, from her sickness and infirmities, she was at the time in a condition of great mental weakness, and that there was gross inadequacy of consideration for the conveyance." In Hardy v. Dyas, 203 Ill. 211, 67 N. E. 852, Hand, C. J., said: "Although inadequacy of consideration, in and of itself, is not a distinct ground for equitable relief, and while, when standing alone, it is ordinarily entitled to but little weight as evidence of fraud, yet when it is coupled with other circumstances showing overreaching or oppression, or it appears that undue influence was exerted over the grantor, or that through age, ignorance, sickness, or mental incapacity the grantor did not fully comprehend his acts, or when by the suppression of material facts or through surprise or stress of financial circumstances he is led into an inprovident bargain, equitable relief will be granted."

Counsel for plaintiff has pointed out that in Fox v. Mackreth, supra, the estate was purchased for £39,500, as against a possible, but at the time very doubtful, maximum of £50,500, making the purchase price, at the most, a possible discount of about twenty per cent. from the extreme maximum value of the estate. In Birdsong v. Birdsong, supra, the discrepancy was at most $1,500. In More v. More, supra, the discrepancy was about $1,000 out of a possible $10,000. In Hardy v. Dyas, supra, the defendant bought property for $2,500 which the court concluded to be worth from $1,000 to $1,500 more; the testimony ranging from $2,500 to $7,000. In Kilgore v. Cross (C. C.) 1 Fed. 578, the discrepancy was at most only a few hundred dollars. In Huguenin v. Baseley, 14 Ves. Jr. 273, the property conveyed was a leasehold; and in Gibson v. Jeyes, 6 Ves. Jr. 266, it was an annuity. In neither case was there any marked or positive inadequacy in the purchase price, and in each case the purchase was made at the request of the vendor; but the court (Lord Eldon) held that the relation in the Baseley case (that of rector and parishioner) and in the Jeyes case (that of a retired solicitor, who had not acted for plaintiff for many years) raised a presumption of invalidity on grounds of public policy, prohibited the purchasers from deriving any profit from the transactions, and required their re-

scission. In Tate v. Williamson, L. R. 2 Ch. App. Cas. 55, the plaintiff, to whom relief was granted, parted with property worth £14,000 for £7,000, part in cash and part in deferred payments.

6. The final question here to be determined is whether or not the trial court was justified in finding, as it did, that after the date on which the contract was signed and before this action was commenced

> The plaintiff, when mentally sound and fully competent and with a full and accurate knowledge of all the facts relating thereto, in all things approved, confirmed, and ratified the sale of said stock to defendant, and the contract evidenced * * *

For present purposes, this will be regarded as the finding of a conclusion of ultimate facts, rather than of a conclusion of law from facts which are not found. It is to be noted, however, that it is conspicuously wanting in any designation of a specific time of, and in any detail of conduct constituting, ratification. It is not sustained by the record.

First. When was Edwin "mentally sound and fully competent" to ratify the transaction? Between January 15, 1900, when the contract was executed, and December 5, 1903, when this action was brought, there were times when his mind approached a normal state, and there were other times when, according to the answer of defendant, accepted for present purposes, he was in all the stages of inebriation, from mere stimulation to temporary insanity. To which of these times did the court refer? The whole of the year 1903 must be excluded, partly because of his mental disturbances and partly because in the latter part of it Edwin was preparing for the present lawsuit. Early in January, 1903, Edwin came to Minneapolis and commenced a severe drinking spell, winding up sick in bed in his brother's house in March. Part of the time after this he was in a sanatorium in Wisconsin. While there he wished to go to a sanatorium in Dansville, New York, a short distance from Buffalo. Counsel for the defendant says:

> His brother Thomas met him in Chicago early in June. Edwin appeared to be in the very best of physical condition, and when his brother asked him if he had not better go on to Dansville with him he utterly rejected the suggestion and would not think of it. On his way to Dansville, Edwin got to drinking and stopped over in Buffalo, went on a prolonged spree there, and finally wound

up by being arrested and thrown in jail. He was subsequently removed to the sanatorium, and after remaining there a few days was taken back at his brother Thomas' request to the sanatorium at Lake Geneva. He recovered quite rapidly from the results of this debauch, after returning to Lake Geneva, but he continued for several weeks to imagine that his brother Thomas was a Spiritualist and had a medium controlling him, and he also imagined that his brother Thomas was wholly responsible for his being arrested in Buffalo and thrown in jail. * * * He imagined that the medium took the form of a magpie talking in his ear and keeping him awake at night.

The subsequent experiences, according to the defendant, were equally agonizing. It is unnecessary to detail them. On October 14, 1903, for the first time, according to plaintiff's testimony, he learned that he had a right to question the stock transaction of January 15, 1900. The action was commenced on December 5, 1903. Plaintiff's case was prepared during the interim. The defendant's counsel insists that the testimony at this time shows

That Thomas H. Shevlin's conduct toward and treatment of his brother during all this time at Buffalo and Dansville and at Lake Geneva, was in every way kind and considerate. * * * Edwin C. Shevlin had then, and during all the time of this trial had, in his mind an insane delusion in regard to his brother Thomas, and a persistent and most unreasonable enmity towards him. * * * Out of the bitter feelings of hostility thus started was the ground of this lawsuit.

Accordingly the period during which Edwin was competent according to the court's finding must have been subsequent to January 15, 1900, and anterior to January, 1903. During this period Edwin was some time in Minneapolis, in California, and abroad, and for some months traveled with his wife and with Mr. and Mrs. Thomas Shevlin. During none of it was he engaged in any occupation, and according to the answer was in such a state that no stranger would have retained him in any employment. The details of the testimony as to his condition in these wanderings have been examined and considered. It would

uselessly incumber the record to discuss its minutiæ here. In the absence of quite clear testimony as to his improved mental and physical status during this period, the conclusion must follow, from his previous history and his complete breakdown in 1903, that he was not in the condition of the normal man, of whom equity would expect prompt and affirmative repudiation of the contract which he had made and of the interest which was paid to him under it. The testimony in fact tends to affirmatively show that during this period Edwin drank more or less and was in the stages of gradual degeneration which finally culminated in the tragedies of 1903.

Second. The record shows that Edwin had not knowledge of the full value of the stock he sold. That he did not have full or accurate knowledge of the principal assets of the companies, their pine lands, on January 15, 1900, has previously appeared. The testimony does not disclose that his knowledge was made precise at any time, or was made reasonably definite until shortly before bringing this action. While he was abroad a financial statement of the companies for January, 1902, showing the stumpage then owned by the companies, was sent him. If a knowledge of its contents, which he denies, be attributed to him, he cannot be legally charged, because of it, with information of what part of the pine land described in it was owned by the companies at the date of the transfer by him and what part was subsequently acquired. Nor can knowledge of the requisite standard be inferred from casual conversations about the business, its growth, and prosperity which occurred in Minneapolis. Accordingly on this branch the case is within the rule formulated in St. Paul Trust Co. v. Strong, 85 Minn. 1, 88 N. W. 256: "To establish a ratification, the facts involved must not only be proven, but it must be shown that it was made with a full knowledge of all the material particulars and circumstances. Imperfect and incomplete information is not sufficient." And see Pence v. Langdon, 99 U. S. 578. It is accordingly unnecessary to determine the legal correctness of this further contention for the plaintiff, namely: Plaintiff's uncontradicted testimony that he learned for the first time, about the middle of October, 1903, of his right in the law to question the contract, must be accepted as true. Therefore the knowledge necessary to be attributed to him before his conduct could be construed into its confirmation is of that date, because "all acts, to have the effect of confirmation,

96 M.—27

must be purely voluntary and done with the intent to ratify that which the party knows he is entitled to disaffirm." Hoffman, V. C., in Fish v. Miller, 1 Hoff. Ch. 267.

Third. No distinct ratification at any specified time is claimed by the defendant, nor found by the court. No affirmative intention to confirm appears in the record.. The conclusion of adoption is drawn from the plaintiff's general failure to object to the transaction, from his unquestioning acceptance of benefits under the contract, and from the continuance of friendly relations between all members of both families, with knowledge on Edwin's part "that Tom hadn't treated him right." The laches which is the gist of the estoppel in pais thus sought to be put into operation could not have existed for much more than three years, in which by the most favorable construction possible, in any view of the case, for the defendant, Edwin could have been in a mental and physical condition to have asserted his right based on fraud. Neither authority nor principle permits such acquiescence to be distorted into an effectual legal waiver of the plaintiff's right to repudiate the contract and to secure relief for constructive fraud. "I know no case in which a bargain made in direct contravention of the policy of the court (as to undue advantage taken of a person in confidential relation) has been allowed to stand merely because it has been submitted to for many years." Hoffman, V. C., in Fish v. Miller, supra. The wrongdoer cannot make extreme vigilance and promptitude conditions of the affirmative disapproval by the party wronged. Pence v. Langdon, supra; Allore v. Jewell, supra; Kelley v. Boettcher, 85 Fed. 56, 29 C. C. A. 14; Chicago v. Kennedy, 70 Ill. 350. In Kilbourn v. Sunderland, 130 U. S. 505, 518, 519, 9 Sup. Ct. 594, 598, the court said: "Reasonable diligence is, of course, essential in invoking the activity of the court; but what constitutes such diligence depends upon the facts of the particular case. Where a party injured by fraud is in ignorance of its existence, the duty to commence proceedings arises only upon discovery, and mere submission to an injury after the act inflicting it is completed cannot, generally and in the absence of other circumstances, take away a right of action, unless such acquiescence continues for the period limited by the statute for the enforcement of such right." This is the rule in this state. Lewis v. Welch, 47 Minn. 193, 48 N. W. 608, 49 N. W. 665. And see Wall v. Meilke, 89 Minn. 232, 94 N. W. 688; Reavis v. Reavis (C. C.) 103 Fed. 813; Ludington v. Patton, supra.

The conclusion follows, from the holding of breach of a confidential relationship and of absence of ratification or laches, that the trial court was in error in finding for the defendant and in refusing all relief to the plaintiff. This, as an appellate court, in so deciding, is restricted to granting the plaintiff a new trial. It cannot make findings of fact in lieu of those that the trial court should have made. Upon these findings, construed as they have been, as, for example, with respect to ratification, and upon them, alone, or in connection with the pleadings, the plaintiff is not entitled to judgment.

Judgment reversed and new trial granted.