FEDERAL TRUST COMPANY ET AL., APPELLANTS, V. WALTER SUNDEEN, APPELLEE.

FILED JUNE 13, 1929. No. 26465.

*T. R. P. Stocker, Ralph W. Ford* and *H. B. Muffly,* for appellants.

*Clarence G. Miles, contra.*

Heard before ROSE, DEAN, GOOD, EBERLY and DAY, JJ., and RAPER and REDICK, District Judges.

REDICK, District Judge.

Action in equity to cancel an assignment of a school land lease for 25 years, made by Julia Walsh, plaintiff's ancestor, to Walter Sundeen, defendant. The plaintiffs are Federal Trust Company, administrator of the estate of Julia Walsh, and John Walsh, devisee. The latter will hereafter be referred to as plaintiff. The lease in question was for 160 acres of land in Lancaster county about 10 or 12 miles from the city of Lincoln. The rent payable to the state was $432 per annum, subject to revision by the state authorities. The land had been occupied for many years by Julia Walsh, her husband, and family, until the husband's death a number of years prior to the transaction complained of, after which event Julia's son John, the plaintiff, ran the farm for a number of years, his mother and younger members of the family living with him. Some five or six years prior to the assignment in question, John married and moved to a place in western Nebraska. The place was then leased by Julia Walsh to the defendant, Walter Sundeen, for one year from March, 1923, at a rental of two-fifths of the small grains and a cash rent of $4 an acre for pasture and $5 an acre for hay land. July 12 another lease was executed for the term of five years from March 1, 1924, and on April 16, 1925, a third lease was executed to Sundeen for a period of twelve years from March 1, 1926. All of these leases were upon the same terms and contained a provision that the lessor shall furnish necessary materials for the repair of buildings and fences as may be required from time to time and mutually agreed upon as necessary. The average gross rental value of this lease to the lessor was about $940 a year, out of which she was required to pay the rent to the state, $432, and about $30 a year taxes on the improvements, and an indefinite amount for repairs, estimated by one witness at about $100, though this seems somewhat excessive. The net returns on the leased property being from $400 to $700 per annum. The improvements upon the premises were of the value of from $800 to $1,600, though some witnesses testified that they were worth from $600 to $700 to wreck

or move off. The lessor was an old lady about 80 years of age at the time of the assignment in question; had always been of a strong, determined and independent character with reference to the conduct of her affairs, asking no advice, but depending almost exclusively upon her own judgment. Her relations with her tenant were most friendly, there having been no disputes or trouble of any kind between them during the five years preceding her death. She kept no accounts and relied upon her tenant to sell her share of the crops and account to her for the rent under the lease each year. It is fair at this point to observe that there is no evidence in the record indicating that the tenant did not fairly account to the lessor for her share of the crops. Mrs. Walsh and the Sundeens, as above stated, were very friendly, to such an extent that she oftentimes referred to them as her children, and the Sundeens at various times would perform little acts of courtesy for the old lady, such as bringing her feed for her chickens and other products of the farm as gifts. The evidence does not suggest that these acts were based upon any ulterior purpose, but were simply friendly gestures growing out of the relations, business and social, of the parties.

Sometime prior to October or November, 1926, there was some discussion between Julia Walsh and Sundeen regarding a sale of the school lease to the latter. Whether these negotiations were initiated by Mrs. Walsh or Sundeen is in dispute, but the weight of the evidence indicates that the subject was first proposed by Mrs. Walsh, and in October or November, 1926, Sundeen went to the department at Lincoln to inquire as to the legal situation, whether Mrs. Walsh could sell the lease, and the proceedings necessary to be taken, and procured a blank assignment. About that time Mrs. Walsh went to her banker, Biddlecom, at Havelock, and told him she was thinking of selling the lease to Sundeen, and asked him whether it would be necessary in such event to change her will, which the banker had drawn for her in 1925 and by which she had willed the lease in question to her son John, the residue of her property to be

divided amongst her children, including John, and he advised her it would not be necessary unless she desired to set aside the proceeds of the sale for John's benefit, which she said she did not. Biddlecom was also the banker of Walter Sundeen, and held his note for the sum of $800; he also advanced Sundeen upon his note, signed by a brother as surety, the sum of $500, being the cash payment upon the purchase of the lease, as hereafter detailed.

Thereafter some discussions took place between the parties as to the price to be paid for the lease, which was finally fixed at $1,000, $500 cash and the unsecured note of Sundeen for a like amount, payable in two years at 5 per cent.

On the evening of January 7, 1927, Mrs. Walsh called up the Sundeens and asked them to come in to her house at Havelock and talk over the sale of the lease. Mr. and Mrs. Sundeen did so, and some discussion of the matter was had, with the result that they were asked to come back the next day and close the transaction. They returned about noon on the 8th and found that Mrs. Walsh had been taken ill, had called a doctor, and arrangements made to take her to a hospital. Upon finding this situation, defendant drove to the bank to get Biddlecom to come to the house to act as a notary in the execution of the assignment, but when he returned Mrs. Walsh was being taken out of the house on a stretcher to the ambulance for removal to the hospital. He testifies that Mrs. Walsh told him to come to the hospital that evening, which he did, accompanied by Biddlecom; but, when they arrived and asked Mrs. Walsh if she wanted to execute the assignment then, she said, no, she was too tired. She asked Biddlecom to advise her about selling the lease, but he refused, telling her she should consult her children. At this time Mrs. Walsh was suffering severely from pain in her back, the doctor diagnosing her difficulty as gall-bladder trouble or a serious disturbance of the liver calling for an operation, but it was considered by the doctor inadvisable to operate, owing to the advanced age and weakness of the patient, and over the objections

of the relatives present. At the hospital Biddlecom suggested to Mrs. Walsh that the rental due the state on the school lease in question and another was delinquent, and suggested that it be paid. Thereupon Biddlecom drew a check on his bank for $440.82, Mrs. Walsh was propped up in bed and signed the check, which was thereafter sent to the county treasurer and paid.

Mrs Walsh remained at the hospital until Monday, the 10th, when she was removed to her home, where she was put to bed under the care of her housekeeper, Mrs. Boos, who had been living with her for some time in that capacity. A daughter of Mrs. Walsh, Mrs. O'Halloran, who lived in Omaha, had been visiting her for about a week, was present at the hospital, and remained with her mother until Saturday, the 15th of January. During this period Mrs. Walsh suffered considerably and was in bed most of the time, attended by Mrs. Boos. During this week the Sundeens had inquired by telephone as to Mrs. Walsh's condition, and on Monday, the 17th, after Mrs. O'Halloran's departure, came to the house with Biddlecom, who wrote out the assignment on the blank furnished by defendant, and the same was signed by Mrs. Walsh while sitting up in bed, acknowledged before Biddlecom as notary, and a check for $500 and a note for the same amount delivered to Mrs. Walsh in the presence of Mrs. Boos. There is some dispute as to whether or not Mrs. Walsh was sitting up in a chair at the time she executed the assignment, but the evidence clearly supports the above statement in that regard.

From that time forward until January 30 no physician was called to attend Mrs. Walsh, and the evidence is in dispute as to whether or not she remained in bed or was up and around sometimes during that interval, but the preponderance thereof, as stated by a disinterested witness, a neighbor who saw her practically every day, indicates that she was only up occasionally, and, as the witness says, sitting in a chair while her bed was being changed. For the last three weeks before her death she was in bed. After her return from the hospital she became weaker and weaker

as time passed, and lingered in that condition until February 17, 1927, when she died.

The learned district judge in a memorandum opinion stated that he considered the case extremely close, and that the rules of law and principles of equity which he deemed applicable conflicted with his personal conception of justice, but that his duty required him to follow the former. He therefore entered a decree for defendant, the costs to be divided. Plaintiffs appeal.

There are four grounds urged by the plaintiffs as reasons for canceling the assignment, as follows: (1) Misrepresentations as to the value of the school land lease; (2) abuse of the alleged confidential relations existing between Mrs. Walsh and her tenant; (3) that the consideration for the assignment was grossly inadequate, giving rise to an inference of fraud; and (4) that Julia Walsh was incompetent to make the assignment at the date thereof. We have arranged these propositions in the order in which we desire to discuss them.

(1) The misrepresentation claimed is that defendant told Mrs. Walsh that the lease in question was only worth about $500, but that he was willing to give her $1,000 for it. The evidence as to the representation made was that it was to the effect that Sundeen had heard that school leases were selling for $500 or $600. Sundeen denied this, but the evidence supports the inference that some such statement was made. However, it is extremely doubtful that such statement had any influence upon Mrs. Walsh. No facts were given nor any circumstances tending in any way to show that the conditions of those sales were at all similar to the one in question, nor, in fact, that any such transactions had actually taken place, and we think, taken alone, that such a representation to a woman of Mrs. Walsh's positiveness of mind would not be sufficient as a basis for rescission of the contract. In this connection it should be stated, however, that Sundeen testified that in his opinion the lease was worth $1,500, and that he thought he was getting a good bargain, which statement will be

considered later on in connection with another question presented.

(2) There existed between the parties no confidential relations as ordinarily spoken of in the cases, such as man and wife, parent and child, etc., but it is contended that by reason of the continued pleasant and friendly relations of the parties during the period of five years that Sundeen was tenant, coupled with the fact that she frequently referred to them as her children and they to her as "Ma," the little kindnesses performed for her by the Sundeens, and the confidence reposed by her in permitting Sundeen to divide the crops and sell her share without question or investigation on her part, the latter had acquired an undue influence over the old lady which had some substantial part in the procurement of the assignment in question. How much these matters may have influenced Mrs. Walsh is a very difficult question to determine from the evidence. There is no doubt that she had a very friendly feeling, if not affection, for the Sundeens, and trusted them implicitly regarding the management of the farm and payment to her of the rentals. She permitted Sundeen to ascertain and sell her share of the crops, never questioning his honesty, and on one or two occasions, in bad years, released him from payment of a portion of the cash rental. The evidence furnishes no inference of any direct effort of Sundeen to capitalize the friendly relations and use them as a lever with which to force her consent to the transaction. It does appear, however, that Sundeen was rather unduly precipitate in his efforts to procure the assignment to be executed at a time when Mrs. Walsh was suffering considerable pain, one of the witnesses testifying that he asked them to delay her removal to the hospital long enough that he might procure the services of Biddlecom, which was refused, and he wanted to talk to her while she was on the stretcher being taken to the ambulance, and thereafter, though as he says at her suggestion, followed her with his notary to the hospital and again tried to procure her signature, at which time the daughter, Mrs. O'Halloran, testi-

.fied that she objected to her mother signing away the state lease for such a "paltry sum," that she ought to get $2,500, and that after Sundeen and Biddlecom had gone her mother said to her, "This is a shame for Walter to bother me on my death-bed." During the week after the return from the hospital and while Mrs. O'Halloran was with her mother, the defendant did not come to the house and made no effort to secure the assignment, but did secure it the Monday following the departure of the daughter for Omaha. Mrs. O'Halloran testified that during that week Sundeen called by telephone and Mrs. Boos answered, saying, "She is here yet," referring to the witness; that this occurred twice. This was not denied by Mrs. Boos, but Sundeen denied ever inquiring if Mrs. O'Halloran was there. We seriously doubt the existence of such undue influence as, of itself, would justify a reversal.

(3) The next question for consideration is the alleged inadequacy of the consideration. It is practically conceded that the 25-year lease was worth from $2,000 to $2,500. Sundeen said he thought at the time it was worth $1,500, but admitted that later he discovered it was worth considerably more. The improvements on the place, belonging to Mrs. Walsh, as they stood, were worth from $1,200 to $1,600, their removable value in the neighborhood of $700 or $800. These improvements were not sold with the lease, so it may be said that the right to remove them at the expiration of the lease would be of little if any value. They were not removable in any event until the expiration of the 12 year lease already held by Sundeen, expiring in 1938. The price to be paid for the lease, $1,000, was agreed upon a week or more prior to the trip to the hospital. However, Sundeen testified that the original price asked by Mrs. Walsh in November was $800 or $1,000, and that the night before the trip to the hospital it was agreed that she should pay the rental in advance for the renewal of the lease, and that Biddlecom called her attention to such payment at the time the assignment was executed; that such payment was the reason for increasing the price from $800 to $1,000.

While at the hospital Mrs. Walsh gave a check for $440.82, which included payment to the state of the rental of these lands to July 1, 1927, in the sum of $216. It therefore appears that in fact all that Mrs. Walsh received for the assignment was $284 in cash and Sundeen's unsecured note for $500. Assuming that the note would be paid eventually, Mrs. Walsh received not more than one-third of the conceded value of the lease, without taking into consideration the value of the improvements. There was also a small balance due Mrs. Walsh, 60 bushels of corn and a small amount of oats, which she forgave the defendant, and three or four days after the execution of the assignment she executed to him a receipt in full to date, without further payment. The district court found and there is no question but that the consideration was inadequate, and the dispute between the parties is whether or not it is so grossly inadequate as to afford of itself an inference of fraud, the plaintiffs contending for the affirmative and the defendant the negative of that proposition. The question is not free from difficulty. If the values involved were much greater, as for example, a consideration of $35,000 for property fairly worth $100,000 we would have little difficulty in concluding that the difference was so wide as to afford a legal inference of fraud. Here, the difference is only about $1,500 or $1,800, and, standing alone, we have serious doubt whether it would be sufficient to stamp the transaction as fraudulent.

The plaintiffs, however, cite a number of cases of similar character to this where the disparity between consideration and value was much less. In *Rarick v. Womer,* 184 Ia. 1016, the amount agreed to be paid was about two-thirds the value, and the contract of sale by a woman 72 years of age, inexperienced in business and unacquainted with land values, and susceptible to the influence and advice of her tenant, to such tenant was set aside as being for a grossly inadequate price. In *Shevlin v. Shevlin,* 96 Minn. 398, a consideration of $70,000 for property found to be worth $95,000 was held to be so grossly inadequate as to entitle

the vendor to relief. So it appears that the determination of the question cannot be based absolutely upon the rule of percentage, but the fact is one to be taken into consideration under all the circumstances surrounding the transaction, and even though the consideration be not so grossly inadequate of itself as to shock the conscience of the chancelor, it may be the controlling factor, when considered with other inequitable circumstances, in determining the rights of the parties. See *Shevlin v. Shevlin*, 96 Minn. 398, and *German Corporation v. Negaunee German Aid Society,* 172 Mich. 650.

(4) Was Mrs. Walsh of sufficient mental capacity to enter into the assignment in question? Upon this question the plaintiffs called three of Mrs. Walsh's children and their wives, also some neighbors, and Mr. Mitchell, the grocerman where she dealt, all of whom gave it as their opinion that she was not competent to transact business at the date of the assignment. On the other hand, Mrs. Boos, the housekeeper of Mrs. Walsh, Mr. Hall, a lumberman of Havelock, and two others stated that they considered her competent. Defendant also called Dr. Miller, who had attended Mrs. Walsh for a great many years, but had not seen her for some time, and who was called on the 30th of January, 1927, and attended her during her last illness, seeing her three or four times. He testified that he talked with Mrs. Walsh, asking her about her physical condition, and that she was possessed of her mental faculties and knew what she was doing at that time; that she would be of sufficient mental capacity to transact business if it went her way, meaning by that "she was a woman that had a mind of her own, when things didn't go her way she would shut up and say nothing to you, sometimes she would tell you things you didn't want to know." He saw her about a week later, and again before her death, but did not notice anything wrong with her mental condition. Defendant also called Dr. McKinnon, who attended her at the time she was taken to the hospital, until which time he had not seen her for some years, who testified that in his opinion

she was apparently normal mentally and perfectly competent to transact business. On cross-examination he declined to give an opinion as to her competency a week later, when the assignment was made, for want of sufficient facts from which to judge. In answer to a question by the court, he said that he had known Mrs. Walsh for 20 odd years and that her mental faculties were not perceptibly impaired when he saw her in January, 1927.

The opinions of plaintiffs' witnesses as to Mrs. Walsh's mental capacity were based largely upon her condition of weakness, lack of memory, and forgetfulness. Very little evidence was produced of any acts or conduct of Mrs. Walsh indicative of mental weakness. One instance was introduced of conduct upon her part as indicating failing mentality consisting of a mistake in the identity of Mrs. Phillip's sister, a larger woman weighing about 200 pounds, for her daughter weighing about half that much and very slight of figure, but the circumstances surrounding this instance are not given in sufficient detail to give it much value from which to draw a conclusion; another where she stated the age of her youngest daughter as 26, when as a matter of fact she had been married for 28 years, indicating to the witness that she was "unable to calculate." So far as the opinion of the witnesses are concerned on this question, we think the evidence is so nearly balanced that the plaintiffs have failed to sustain a preponderance thereof; the medical testimony appears the more satisfactory. It is fairly to be inferred, however, that Mrs. Walsh was a very sick woman and was gradually getting worse from day to day after the visit to the hospital, except at one time, about a week before her death, when she rallied for a short time.

In addition to the above, the evidence fairly discloses the following facts and circumstances having a bearing upon the question before us: At the time the son John went west he and his mother had some business difficulties in settling up their affairs, and John did not come to see his mother for over three years, and Mrs. Walsh did not

like John's wife, all of which tended to create an estrangement between them. Notwithstanding this fact, in October, 1925, the mother willed to John the lease in question. For two years prior to the assignment the farmers in the vicinity had had a hard time, crops had been poor and returns to the landlords correspondingly reduced. The rentals received by Mrs. Walsh for 1925 were about $700, and for 1926 $500. She had expressed her dissatisfaction with the returns from the lease and a desire to get rid of it. At the date of the assignment she had from $1,500 to $1,700 in the bank, but some $1,300 was due for taxes on land in Minnesota, besides about $440 due on the lease in question and another school lease. The improvements on the farm were badly in need of repairs, which would call for a considerable expenditure on the part of the lessor. Mrs. Walsh suffered from rheumatism in her hips, making it difficult for her to get around, and after her return from the hospital expressed the opinion that she was going to die.

There are many other matters revealed by the evidence having some weight on one side or the other in determining the question before us, but not of sufficient importance to be mentioned here. The evidence was very conflicting, and it may be said that the direct testimony of the interested witnesses on both sides was considerably weakened by very able and searching cross-examination. It is impossible in many instances to reconcile the testimony of several of these witnesses with their statements made at a prior time in depositions taken in the case. In such situation the rule is well established that the finding of the trial court upon the facts is entitled to consideration upon the trial *de novo* in this court.

We are, then, to determine from all this evidence and the surrounding circumstances of the execution of the assignment in question, whether or not that document really represents a voluntary act upon the part of Mrs. Walsh, binding between herself and the assignee, and therefore binding upon her devisee, John Walsh, or whether her consent thereto was obtained under such circumstances of undue

influence, pressure, and physical or mental weakness that in equity and good conscience it should be set aside.

After a most careful consideration of the problem of which we are capable, from every angle, we have concluded that the plaintiffs have failed to establish by a preponderance of the evidence, with that reasonable certainty required in this class of cases, that the assignment was procured by undue influence, that the assignor was mentally incompetent to make it, or that the inadequacy of consideration under all the circumstances was such as to afford a presumption or inference of fraud sufficient to set aside the transaction. Whatever we may think of the soundness of judgment exercised by the assignor, we are unable to say that she was incapable of exercising that judgment, but on the contrary it appears to us that she was dissatisfied with the situation and preferred to avoid the trouble, contingencies and probable expenditures incident to the continued ownership of the lease, and to accept in lieu thereof a present consideration considerably less than the probable value of the lease to one in a different situation than herself as regards the management of the business, the contingencies affecting a profitable return upon the investment and their own financial situation. Upon these considerations we cannot hold that the transaction was either unreasonable or inequitable. We conclude that the case was properly disposed of by the opinion of the learned commission, and the same is again approved, and rehearing denied.

AFFIRMED.