LOUISE F. RARICK, Appellee, v. WILLIAM H. WOMER et al., Appellants.

VENDOR AND PURCHASER: Relief from Executed and Executory Contracts Contrasted. An *executory* contract of sale will more readily be set aside on a showing of inadequate consideration, lack of business experience, and want of knowledge of

values on the part of a vendor, than when the contract is wholly *executed.*

*Appeal from Johnson District Court.*—R.   P.   HOWELL, Judge.

NOVEMBER 16, 1918.

SUIT in equity to set aside and declare void a written contract for the sale of land.   The trial court found the equities to be with plaintiff, and entered a decree as prayed. The defendants appeal.—*Affirmed.*

*Dutcher, Davis & Hambrecht,* for appellants.

*Stephen Bradley,* for appellee.

WEAVER, J.—On the date on the contract in question, the plaintiff was the owner of a farm of 204 acres in Johnson County, Iowa.  She was 72 years of age, a widow, and lived in Iowa City, several miles from the farm.   Her husband, who formerly owned the land, died in 1907.   During his lifetime, he leased the land to the defendant William H. Womer; and under successive leases, the latter continued to occupy the property, as tenant, until the transaction now in controversy.   On October 7, 1916, a written contract was entered into between plaintiff and Womer, by which plaintiff undertook and agreed to sell and convey the land to Womer for the agreed consideration of $17,500, of which sum, $1,000 was to be paid down, and the remainder in deferred installments.   On November 15, 1916, this action was brought to cancel and set aside the contract, as having been obtained by fraud and undue advantage.   The petition alleges that plaintiff was living alone, without intimate friends or acquaintances, and was unacquainted with the market values of land in that vicinity; and that defendants, knowing her condition and situation, took advantage of her age, her business inexperience, and ignorance of the

actual value of her lands, and falsely and fraudulently represented to her that said lands were of the fair value of $17,500, well knowing that, in truth and in fact, they were worth more than twice that sum, and thereby induced her to enter into the contract to sell the land to them for a grossly inadequate consideration. It is further alleged that defendants were old acquaintances of the plaintiff's, and had occupied the land as tenants for many years; that, at the time the contract was made, she was a guest of the defendants' in their home; and that, acting upon the advantage thus afforded, they importuned her to sell them the land, and, being ignorant of the real value of her property, and relying upon defendants' representations with reference thereto, having confidence in their friendship and honesty, and having no independent counsel or advice, she yielded to their solicitations, and signed the contract, and received from defendants the sum of $1,000. As a part of her petition, she tenders to defendants repayment of said sum of $1,000, with interest from the date of the contract, and asks that the agreement be rescinded and cancelled.

Answering the petition, the defendants admit the making of the contract and the payment by them of $1,000, to apply on the agreed price of the land, and deny all allegations of fraud and undue advantage on their part.

Trial was had to the court, which found for plaintiff, and entered a decree granting her the relief prayed.

The general rules of law and equity applicable to cases of this character are well settled, and are not the subject of material dispute between counsel. Recognizing this situation, the arguments with which we have been favored are naturally and properly directed, in the main, to the inquiry whether the facts shown are such as call for the remedy applied by the court below.

It is to be conceded that the question is not one entirely free from doubt; but, on careful examination of the

record, we are led to concur in the conclusion of the trial
court. Nothing is to be gained by prolonging the opinion
in a purely fact case for an extended statement of the tes-
timony. The result in each case of that character depends
so much upon its own peculiar facts and circumstances that
its decision has little value as a precedent. In outline, the
case made on behalf of plaintiff is substantially as follows:
Soon after the death of plaintiff's husband, the land of
which he died seized was sold, under order of court, and
plaintiff bought this farm at the price of $15,000, or about
$75 per acre. As already stated, the defendants had been
tenants from a date anterior to this purchase, and con-
tinued in possession, under successive leases, until the
transaction in question. Plaintiff had several children, who
had reached maturity and gone out from her home. She
lived alone in Iowa City, several miles distant from the
land. There is no evidence of any estrangement between the
mother and her children, but she seems to have preferred
to maintain a separate home, and asked and received little
counsel or advice from her sons and daughter. A friendly
intimacy grew up between plaintiff and defendants, and
for years she had been in the habit of visiting them on the
farm, remaining several days at a time. She was known
and addressed by them as "Aunt," and it is quite evident
that she had much confidence in them. She says that she
did not know or understand that the market value of her
land had largely increased after she purchased, and relied
upon the judgment and representations of Womer in respect
thereto. While not a recluse, in the strict sense of that
term, the world in which she lived was a narrow one, and
she came into intimate touch with few people. The evidence
does not show her to have been of unsound mind, nor so
incompetent as to require a guardian or trustee in the
conduct of her everyday affairs; but it does appear that
she was ignorant of the real value of her property, and

peculiarly susceptible to the influence and advice of her tenant. According to her statement, the defendants came to her place in Iowa City, and, upon their invitation, she went to their home on the farm, where she remained several days. While there, she says, defendants pointed out to her the need of repairs or changes in the improvements on the land, and she expressed her objection or reluctance to incur the expense. Thereafter, on the same or following day, Womer broached the subject of purchasing the land, and she told him she would sell, if she could get what the land was worth; and, in reply to his question of what price she wanted for it, she told him, $125 per acre; but he responded that it was not worth that price, and that the land ought to be sold at a lump price, and not by the acre. He offered her $17,500; said that it was all the land was worth; and this she accepted. So far as appears, plaintiff did not ask time to consult her family or other advisers; and defendants, on their part, did not suggest it; and, from the time of the talk mentioned, until the matter culminated in the written contract, she appears to have been closely accompanied by the defendants, or one of them, at all times when there was any opportunity to see or consult with others.

The testimony of defendants, and their version of the circumstances leading up to the contract, are stated by their counsel, in argument, as follows:

"As had been the custom for many years, Mr. Womer 'came up the following week on Tuesday, and took her down to the farm. She stayed with defendants until Friday morning, during which time nothing was said about buying or selling the farm, at which time defendant suggested that they go out and look the place over, which they did, driving over it in defendant's automobile. In the afternoon, they drove to a neighbor's, and also drove to the home of John Rarick, a son of the plaintiff, who lives a neighbor to the defendant, where they spent about an hour. On the follow-

ing morning, defendant suggested to her that they talk over
the matter of the sale of the place, and if they could come
to an agreement, all right, and, if not, they would have to
do something else. Defendant says that plaintiff asked him
what the farm was worth, and he replied to her: 'I can't
sell the place and buy it both. I know what I will give. I
know what it is worth to me.' She replied, 'Is it worth
$20,000?' He answered by saying that it might be worth
that if the buildings were in good shape, but that it would
take a lot of money to repair it, and that it would not be
worth that to him. She said she would not spend any
money on it, and that she wanted $20,000 for it. Defendant
said, 'You paid $15,000 for the farm, and now you want
$20,000 for it, but the farm is worth just $17,500 to me;'
whereupon she told him he could have it at that price."

Reading the two stories together, it is difficult to avoid
the conclusion that the invitation to plaintiff to make this
visit was extended with a view to utilizing the opportunity
thus afforded to bring about a purchase of the land, and
that the exhibit of the alleged need of repairs and improve-
ments requiring the expenditure of money on her part was
planned to inspire in her a desire to dispose of the property;
and, if her story is to be credited, it was only when this
strategic approach had been successfully made, that a pur-
chase of the property from her was first suggested by the
appellants. Plaintiff's lack of business judgment, as well as
her peculiar confidence in the defendants, is shown by the
fact that, at this juncture, when the person of ordinary ex-
perience and capacity would realize the necessity of looking
elsewhere for advice, she turned to the tenant and proposed
buyer, asking him what the land was worth. She says, as
a witness, that she knew nothing of the advanced values of
farm lands in that vicinity; and, being asked whether she
relied upon Womer's statement as to its value, she replied,
"Why, certainly. I supposed he had bought land, and I sup-

posed he knew what land was worth. I took his word for it."

As to the actual market value of the land, each party produced five witnesses. On part of plaintiff, the average estimate is from $132 to $135 per acre, and on part of defendants, about $93 per acre; or, if we average the estimates of all the witnesses, it would show a value of $112 to $114 per acre. As a question to be determined from an original examination of the record, we are impressed with the view that the showing on the part of plaintiff is the more satisfactory, and that the land was fairly worth from $125 to $130 per acre. The price which defendants agreed to pay was slightly less than $86 per acre.

Now, while it is true, as appellants argue, that, generally speaking, mere inadequacy of consideration is not sufficient to establish fraud in the purchaser, it does become evidence of fraud when the inadequacy is so gross as to shock the conscience, or to naturally induce in the impartial mind a conviction that the seller must have been imposed upon. In the language of Mr. Pomeroy:

"The doctrine is settled by a consensus of decisions and dicta that, even in the absence of all other circumstances, when the inadequacy of price is so gross that it shocks the conscience and furnishes. satisfactory and decisive evidence of fraud, it will be a sufficient ground for canceling a conveyance or contract, whether executed or executory." 2 Pomeroy on Equity Jurisprudence (3d Ed.), Section 927.

So, also, if the inadequacy be material, but not so gross as above suggested, and it is accompanied by other inequitable circumstances or badges of fraud, such inadequacy is a very material fact in support of the conclusion that there was fraud in fact. Upon this subject, it has been said that:

"Where fraud is charged, and it appears that the price given is much less than the real value of the property, it is a strong circumstance to prove the fraud; as the love

of gain and the disinclination of all men to abandon their property is so strong that it is unusual for persons knowingly to part with property of great value for only a trifle." *Lloyd v. Higbee,* 25 Ill. 603.

No court has undertaken to lay down a rule as to the precise degree of inadequacy of consideration which may be pronounced gross, or so gross as to raise an inference or presumption of fraud; nor can one be framed, with safety. Few cases are made to rest upon the mere ground of inadequacy; but each, as a rule, has its own peculiar accompaniment of circumstances which lend color to the transaction, and which serve to strengthen or rebut the inference that a wrong has been done. But if it be clear that the price is, to a marked degree, less than the fair market value, "that circumstance, taken in connection with others of a suspicious nature, may afford such a vehement presumption of fraud as will authorize the court to set it aside." *Wormack v. Rogers,* 9 Ga. 60.

That the price named in this contract was greatly less than the land was worth, is hardly open to reasonable doubt. Whether the discrepancy was so gross as to be proof *per se* of fraud, we need not decide; for, even if we should hesitate to so hold, we think the circumstances under which the sale was brought about abundantly justify the suspicion of a purpose on part of defendants to overreach the plaintiff, and this, with the inadequacy of consideration, is sufficient to sustain the decree below. It may be true that no one of these circumstances, taken by itself, is so marked with bad faith as to afford foundation upon which to base a finding of fraud; but, taken altogether, the conclusion is quite inevitable. It is not necessary to find that the plaintiff is an imbecile, or incompetent, or that defendants subjected her to undue influence, in the technical sense of that term. It is enough that, as we find, she was so lacking in experience and capacity to transact business, and so with-

out adequate appreciation of the value of her property, and of the effect of her contract upon her estate therein, as to render her unable to deal with the defendants at arm's length, and properly protect her interests in a transaction of this magnitude, and that defendants took advantage of this situation, and of her confidence in their disinterested friendship, and thereby secured a contract for the purchase of her land at an unconscionable bargain—this is enough to call for the interposition of equity for a cancellation of the agreement. The authorities cited and relied upon by the defendants, as to the degree of proof required on part of plaintiff in an action to set aside and cancel deeds made, executed, and delivered in due form, are not quite in point. The cases cited have reference to completed transactions and executed contracts. Here, the transaction is yet incomplete, and the contract is still executory. The suit was brought without undue delay, and the court will more readily decree a rescission under such circumstances than it would if the demand for relief had been delayed until the deal had been fully consummated.

Bearing quite directly upon the points made in argument for appellant is the following from the Indiana court, in a case brought at law for damages for fraud perpetrated by a purchaser of land upon the seller. There, as here, the alleged fraud consisted largely of misrepresentation by the purchaser concerning the value of the property. The court says:

"It is true that weakness of mind alone does not render one incapable of making a contract. Weakness or feebleness of mind may, however, become of controlling influence, when connected with other facts tending to establish fraud. While mental weakness alone may not be sufficient to destroy capacity to contract, yet, if it is accompanied by undue influence, duress, inadequacy of consideration, misrepresentations, concealment, taking advantage of ignorance, in-

experience, and want of advice, and the like, any convey-
ance procured by such means will be set aside.  *  *  *
'The design of the law is to protect the weak and credulous
from the wiles and stratagems of the artful and cunning,
as well as those whose vigilance and sagacity enable them
to protect themselves.'" *Culley v. Jones,* 164 Ind. 168 (73
N. E. 94).

See, also *Garr v. Alden,* 139 Mich. 440 (102 N.
W. 950). The courts will not go out of their way to find
reasons for upholding an unconscionable contract, especial-
ly where the parties can be restored to their *status quo*
without loss of anything to either, except the inequitable
profit which one of them would otherwise reap from its en-
forcement at the expense of the other.

"It does not avail * * * that sharp business men might
not have been so readily deceived. Possibly they might not.
But the law does not seek to encourage the practice of
cunning arts upon those who are not well qualified to resist
them. The character and business capacity of the person
operated on form a very important element in fraud. If the
effect is produced, and is intended to be produced, that is
enough. There can be no splitting of hairs to sustain un-
conscionable action." Campbell, J., in *Swimm v. Bush,* 23
Mich. 99.

The foregoing sufficiently indicates our reasons for
sustaining the decree of the trial court, and it is—*Affirmed.*

PRESTON, C. J., GAYNOR and STEVENS, JJ., concur.