FRED MOSER, Appellee, v. H. O. MEADE et al., Appellants.

CONTRACTS: Rescission and Cancellation—Fraud. Evidence reviewed, in an action to rescind contract for exchange of lands for fraud and deceit, and *held* that the evidence of defendant's fraudulent purposes, in connection with the gross inadequacy of

the consideration, was sufficient for the rescission and cancellation of the contract for the sale of the land.

*Appeal from Mills District Court.*—THOMAS ARTHUR, Judge.

JULY 7, 1919.

ACTION in equity to rescind and cancel contract for sale of land. There was a decree for plaintiff, as prayed, and defendants appeal.—*Affirmed.*

*John Y. Stone* and *C. E. Dean,* for appellants.

*Saunders & Stuart* and *J. M. White,* for appellee.

WEAVER, J.—The plaintiff is a native of Germany, where he lived until 24 years of age, when he came to this country, and finally settled in Dallas County, Iowa, where he has since made his home. He had accumulated some property, and, at the time of the transaction now in controversy, was the owner of 200 acres in Dallas County. In the year 1904, he purchased a farm of 320 acres in Howell County, Missouri. One of his sons appears to have occupied the Missouri land, and plaintiff, while retaining his home in Iowa, has visited the son frequently.

The defendants, H. O. Meade and George E. Meade, reside at Glenwood, and are, to some extent, engaged in the real estate business.

In April, 1914, plaintiff, being then with his son on the Missouri farm, was called upon by the Meades, who were accompanied by one Williams, a local real estate agent. As to what occurred there, in the way of talk or negotiation, there is a dispute, but it resulted in plaintiff, Williams, and the Meades' meeting at a bank in a neighboring town on the following day. At that meeting, a writing was made and signed as follows:

"Willow Springs, Mo., April 23, 1914.
"Contract of agreement entered into by and between

Fred Moser of Hutton Valley, M., and H. O. Meade of Pacific Junction, Iowa. Moser agrees to put in his 320-acre farm where he now lives, near Hutton Valley Mo., Howell County, together with all stock, consisting of seven head of horses, two milch cows, one of them with young calf, four one-year old calves, forty-two head of grown sheep, and forty-two head of young lambs, twelve head of hogs, four dozen or more chickens, three stands of bees, this year's shearing or crop of wool from forty-four head of sheep, two hams, two sides of meat, a quantity of lard, all canned fruit in cellar, all household and kitchen furniture in and about the house, all tools, farm and garden implements, all corn, hay, and oats in the barn, all growing crops and crops now being put in on said place.

"Said Moser to be allowed a consideration of seventeen thousand seven hundred and fifty dollars ($17,750.00), to be applied in exchange toward one farm of three that he may choose. Said three farms located about twelve miles southwest of Osceola, Iowa. One farm three hundred acres at one hundred and fifty dollars ($150.00) per acre. The other two farms at one hundred twenty-five dollars ($125.00) per acre.

"It is mutually agreed that both parties to this contract are to furnish merchantable title and abstract and all taxes paid to date.

"This contract is subject to the approval of both parties after the examination of said lands, and if not agreeable, said contract is void and subject to cancellation without consideration, cost or forfeiture in any way.

"Said Moser further agrees to go ahead with the farm work, putting in the crop, caring for the stock, etc., as his own, assuming all responsibility for everything until said deal is closed and deeds and abstracts approved and stock delivered together with all other personal property as herein

mentioned, and to sell or dispose of nothing of said stuff in the way of feed or stock.

"Said Moser further agrees that he or his son will remain in charge and continue the farm work and the care of the stock the same as if it were his own until the 10th of May, 1914, without charge, if necessary to remain longer, he agrees to stay and perform said duties for the sum of twenty dollars per month ($20.00).

> "H. O. Meade [Seal]
> "Fred Moser [Seal]

"Witnesses:

> "C. H. Burchard
> "Con Williams."

The parties then separated, plaintiff going to his home in Dallas County, it being understood that they would meet within a few days at Council Bluffs, and together examine the three farms mentioned in the contract.

Plaintiff went to Council Bluffs, where he met the Meades. Thence they went to Pacific Junction, and on the following morning, took a train for Osceola, near which place was the land mentioned in the writing. At Glenwood, the party was joined by one Bromley, another real estate man, who was also interested in making the deal. They visited the land spoken of in the contract as a "farm of 300 acres." Bromley swears that plaintiff said the land suited him all right, but the price was high. According to plaintiff's testimony, he told them he did not like the property, and would not take it.

Returning to Pacific Junction, the older Meade, with plaintiff, stopped at a hotel for the night. On the following morning, Bromley appeared with a car, and, taking in plaintiff and the two Meades, went to Council Bluffs. From the hotel, the elder Meade sent a telephone call for one Sweet, a lawyer in Omaha. On Sweet's arrival, the entire party took dinner together, and thence the Meades, Brom-

ley, Sweet, and plaintiff went to the office of one Alberti, another real estate agent. There Sweet prepared a form of deed from plaintiff and wife to the elder Meade for the Missouri land and a bill of sale from plaintiff to the younger Meade for the personal property on the Missouri farm, and wrote upon the back of the contract, already quoted, a so-called "acceptance," as follows:

"We, H. O. Meade and Fred Moser, parties to the within contract, each for himself says: I hereby accept and approve the within contract; and I, H. O. Meade, for myself state: I have examined the within land of said Fred Moser, in Howell Co., Mo., together with the stock and personal property thereon, and I hereby accept of the same, and close the deal on the terms of the within contract. And I, Fred Moser, hereby state: I have examined the land offered by H. O. Meade, as per the written contract, and I hereby approve of and accept the following land, to wit: The NE¼ of Section 7, and the SE¼ of S. 6, except the S½ of the NW¼ of the SE¼ of Sec. 6, all in Twp. 70, R. 26, Decatur County, Iowa, which I take at the agreed price for forty-five thousand dollars. And I hereby close our trade, or exchange of property on said terms."

At this stage of the proceedings, it is contended on the part of the defendants that Alberti, at plaintiff's request, read these several papers to plaintiff, and that he indicated his assent thereto, signed the bill of sale and the "acceptance," and received the form of deed, with the understanding that he would take it home where he and his wife would execute it together for final delivery.

It is also asserted by defendants that it was there made known to plaintiff that the 300-acre farm was incumbered by a mortgage for $15,000, and that he orally agreed to assume its payment as a part of the purchase price, and pay in cash the remainder of the price of the 300 acres on the basis of $150 per acre. It further appears that neither

of the Meades nor Bromley owned the 300-acre tract, but that it was owned by one Austen, living in Omaha; that Austen had given Bromley an option for its purchase at a price not stated, and that Bromley had, in turn, optioned it orally to the Meades at $100 per acre. This statement will throw some light upon the next move.

After procuring plaintiff's signatures to the bill of sale and acceptance, Bromley took the Meades and Sweet and plaintiff in his car, and drove over to Omaha. Arriving there, Sweet and the younger Meade took plaintiff for a stroll about the streets, and inspected the courthouse and a large department store. During this time, the elder Meade and Bromley hunted up Austen, who made a deed of the 300 acres to plaintiff, subject to the mortgage of $15,000, and deposited it in a bank, to be delivered to plaintiff on presentation of his own deed to the Missouri land, and paying the additional sum necessary to make up the sum of $45,000.

This being accomplished, Bromley and the elder Meade picked up the younger Meade and plaintiff, and returned to the hotel in Council Bluffs. Until such return, plaintiff was not informed of the purpose of the visit to Omaha, or of what had been done there, or of Austen's ownership of the land. While on the return trip, or immediately after they reached the hotel, plaintiff informed the Meades and Bromley that he would not make the deed, and would not consummate the deal. Having found him firm in his expressed determination not to go any further in the transaction, the elder Meade immediately caused original notice to be served upon the plaintiff of an action at law in the district court of Pottawattamie County for the recovery of damages in the sum of $5,000 for breach of his alleged contract. That action was later dismissed. It is to be said, also, that the evidence will justify a finding that not until this trip to Omaha and return was the plaintiff made aware that he

had not been dealing with the real owner of the land, or know of the incumbrance he would be required to assume.

In the following December, plaintiff instituted the present action to cancel the contract. In support of his prayer for relief, plaintiff alleges, in substance, that he was made the victim of fraud and deceit at the hands of the defendants; that he has only an imperfect understanding of the English language; that he did not know or understand that any paper signed by him constituted a contract or binding agreement to exchange the Missouri land for the 300-acre farm; but that the real effect and meaning of the agreement actually made between the parties was that defendants were agreeing to purchase the Missouri land for the price there named; and that plaintiff was to be under no obligation to take any other land in exchange therefor, unless, upon inspection, he should desire to do so: and he avers that he did look at the land, and then and there and at all times since has refused to take it.

He further avers that the defendants, conspiring and designing to take advantage of his ignorance, represented to him that the papers presented for his signature were in accord with the agreement; that they gathered about him a large number of persons, who, by persistent effort, so confused and distracted his attention that he could not intelligently comprehend the true meaning or legal effect of such instruments, and that, as soon as he realized the truth of the matter, he at once refused to proceed any further.

The defendants deny all charges of fraud and wrong on their part. They also plead, by way of counterclaim, the alleged contract with the plaintiff and his refusal to perform, and demand a recovery of damages in the sum of $7,500. After hearing the testimony, the trial court expressed its conviction that the transaction on part of the defendants was a "gigantic fraud," and entered a decree for cancellation of the contract as prayed.

The extended outline of the facts we have already given makes it quite unnecessary that we devote much further time or space to a discussion of the evidence. When we add to those details the further fact that the Meades were men without a dollar of capital; that they had no right, title, or interest in the 300-acre farm, except what they call an "oral option" from Bromley to buy it at $100 an acre, an "option" for which it does not appear that they ever paid or promised to pay a dollar; that Bromley himself had neither title nor interest, except an alleged option (not produced) from Austen; that the land was of an inferior quality, and shown to be worth materially less than $100 an acre, being part of a larger tract sold in 1913 at $50 an acre, the situation as a whole makes up a composite picture, in which an eye of average experience and observation may readily trace the features of a scheme too inequitable to receive the approval of a court of justice.

The proposition urged by counsel for appellant, that proof of mere inadequacy of consideration on the one hand, or extravagance of consideration on the other, does not necessarily establish a charge of fraud, may be conceded; but, like most general rules, it has its limitations. In the recent case of *Rarick v. Womer*, 184 Iowa 1016, we had occasion to consider this question, and said that while, generally speaking, mere inadequacy of consideration is not sufficient to establish fraud, it does become evidence of fraud when the inadequacy is so gross as to shock the conscience, or to naturally induce in an impartial mind a conviction that the party must have been imposed upon; and in support of this view we quoted approvingly Mr. Pomeroy's statement that, under some circumstances, inadequacy of consideration may be so gross as to "sufficient ground for canceling a conveyance or contract, whether executed or executory." 2 Pomeroy on Equity Jurisprudence (3d Ed.), Section 927. We there further said—and the language is very pertinent to

the case now before us—that, if the inadequacy be material, but not so gross as above suggested, and it is accompanied by other inequitable circumstances or badges of fraud, it is a very material fact in support of the conclusion that there was fraud in fact. We further pointed out that "few cases are made to rest upon the mere ground of inadequacy, but each, as a rule, has its own peculiar accompaniment of circumstances which lend color to the transaction and serve to strengthen or rebut the inference that a wrong has been done."

This record is resplendent in its indications of a well-organized plan to lead the plaintiff into a deal the effect of which would be to unload upon him a tract of inferior land at a grossly exaggerated valuation, and to enable the Meades and Bromley and their coadjutors to accomplish the heretofore supposedly impossible feat of making something out of nothing.

The very perfection of the organization which surrounded the plaintiff from the time of his first appearance at Council Bluffs; the smooth working of its co-ordinated parts; the appearance upon the scene at exactly the right moment of each actor in the drama; the careful manner in which constant touch with him was insured until it was thought he had gone too far to execute a successful retreat, lend all the color needed to fairly suggest the existence of fraudulent purpose, and, in connection with the gross inadequacy of the consideration which plaintiff was to receive, make the case a clear one for equitable relief.

It may be admitted that, if plaintiff, with a full and fair understanding of the facts, signed and delivered the bill of sale and "acceptance" prepared by Sweet, the court would not interfere to relieve him. But the evidence fairly negatives that fact. Though by no means an incompetent, the range of his life and experience had been narrow; his knowledge and comprehension of the English language

were limited; he could not read the papers prepared for his signature; the reading by another of the formal language in which they were written would scarcely be more intelligible than so much Greek; and, surrounded as he was by the defendants and Bromley and their various agents, all assuring him that everything was all right, it is not very strange that he should have been misled as to the nature and effect of the transaction.

He did awake to the situation while the deal still remained wholly executory, and distinctly refused to go further, and this he had the right to do. The defendants, though in a court of equity having jurisdiction to compel specific performance of the contract if it be found equitable, ask no such relief, and content themselves with a counter demand for damages. They have suffered no recoverable damages, and, in equity and good conscience, the contract should be declared void.

The decree of the district court is—*Affirmed.*

LADD, C. J., GAYNOR and STEVENS, JJ., concur.